MICHAEL REED, Plaintiff-Appellant, v. NORTHWESTERN PUBLISHING CO., d/b/a The Commercial News *et al.*, Defendants-Appellees.

Fourth District No. 4—83—0714

Opinion filed November 30, 1984.

Richard B. Opsahl, of Rantoul, for appellant.

Thomas B. Meyer, of Acton, Acton, Meyer & Smith, of Danville, for appellees.

JUSTICE MILLER delivered the opinion of the court:

The plaintiff, Michael Reed, brought this action for libel against the Northwestern Publishing Company, publisher of The Commercial

News, a newspaper in Danville, and against two of its reporters, Bob Wilson and Carl Young. Wilson and Young are the authors of allegedly defamatory articles concerning the plaintiff which appeared in The Commercial News. The trial court granted the defendants' motion for summary judgment and later denied the plaintiff's motion to vacate that order. This appeal followed.

The newspaper articles at issue stemmed from a grand jury investigation of burglaries and thefts allegedly committed by several members of the Danville police department during 1970 and 1971. Testimony on this subject was presented to grand juries in several sessions in 1977 and 1978, and a seven-page report summarizing the testimony and the current grand jury's findings was released to the public on December 20, 1978. The next day, The Commercial News published two articles about the investigation and the grand jury report, and other articles on the subject appeared later.

The grand jury report referred to the plaintiff by name twice; he had been a member of the Danville police department during the period under investigation, and he was a member again at the time the articles were published. The dispute here arises from the interpretation that the grand jury report received in the pages of The Commercial News. The plaintiff contends that the report referred to him in a neutral manner but that the newspaper articles portrayed him instead as a participant in the misconduct. In ruling on the defendants' motion for summary judgment the trial court held that the plaintiff, as a police officer, was a public official for purposes of defamation law. Therefore, the court applied to this action the constitutional rule announced in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726, which "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The principal question raised in this appeal is whether summary judgment was properly granted on the issue of actual malice.

## I

According to the grand jury report, 34 unsolved burglaries were committed in Danville in 1970 and 1971; evidence was presented connecting about half the burglaries to members of the police department. The burglaries occurred at night, and the targets were commercial establishments; money, liquor, and other items of merchandise were taken. Former and current members of the Danville police de-

partment were among the witnesses who testified before the grand juries. Two former officers, Richard Massey and Jack Roland, who were granted immunity from prosecution in exchange for their testimony, admitted that they had taken part in a number of the burglaries. They described several of the occurrences and named other officers who had participated.

The plaintiff's name was mentioned in the grand jury report twice. The first reference came in the summary of Officer Joseph Miller's testimony; Miller, at the time of his appearance before the grand jury, was a member of the department, as he had been during 1970 and 1971. At some point during those years Miller began to suspect that police misconduct was occurring, and he and several other officers eventually took part in an internal investigation of the problem. Officer Miller described a police burglary of the local American Legion hall, an occurrence in which Massey and Roland admitted their involvement. The grand jury report said:

> "Officer Miller described the Legion burglary of December 21, 1970 and how Massey had fortuitously discovered an open window, failed to call it in, met with Officer Hill and returned to the Legion, leaving Miller posted outside. Miller testified that Massey had previously questioned him concerning whether upon finding a place broken into, would he accept something taken by Officers[.] Massey also asked him what his favorite liquor was; to which Miller replied, 'Scotch'. After all Officers who initially responded; including: Calvin Norman, Jerry Hill, Jack Roland and Michael Reed, had left, the owner was called to check out the premises. When they left the scene, Officer Miller found a bottle of Scotch under his side of the seat in their squad car."

The other reference to the plaintiff in the grand jury report came in the summary of the testimony of Lieutenant Edwin McGee, who like Miller had taken part in the police department's internal investigation. The grand jury report said:

> "Lt. Edwin McGee testified as to his responding to the August 25, 1971 burglary at Harding's Pharmacy where he found Officers Hill and Reed at the scene with Roland and Massey showing up later. His investigation of the scene, specifically including the watch case and shaver display showed nothing to be missing or disturbed, however, when he read the report submitted the next day by Hill, it showed watches, shavers and radios to have been taken along with a large amount of cash."

On December 21, 1978, the day after the grand jury report was

made public, The Commercial News published photographs and two articles relating to the investigation and report. The caption "Current Officers Implicated in Report" appeared under photographs of the plaintiff and of two other members of the Danville police department, Robert Testa and Arnold Yanders, and of a county deputy sheriff, Kenneth Cox. A caption appearing below that said, "Four current law officers—Arnold Yanders, Robert Testa, Michael Reed and Kenneth Cox—were named by grand jury witnesses as joining in at least one or a few of the reported break-ins by policemen." In an article bearing the headline "Grand Jury Describes Police Burglary Setup," defendant Bob Wilson referred to the involvement of Roland and Massey in several burglaries and then wrote:

"Massey, Roland and several other witnesses at the grand jury sessions identified other officers involved, too.

They included former policemen Jerry Hill and Richard Moody and current officers Sgt. Robert Testa, patrolman Arnold Yanders, patrolman Mike Reed, and former patrolman Kenneth Cox, who is now a county deputy."

The article went on to say, "Lt. Edwin McGee also testified about the Harding Pharmacy burglary, saying he came on the scene and found Hill, Roland, Massey and Officer Mike Reed inside but without their flashlights turned on." An article accompanying this one bore the headline "3 Deny Roles in Burglaries." It quoted the plaintiff as saying, "I didn't know a thing about [the police burglaries] and I can't say anything about it." This article also said, "Grand jury testimony summarized in the report said Reed was spotted inside a pharmacy with two officers who committed several burglaries."

On December 23, 1978, The Commercial News published another article by Wilson on the investigation. In summarizing the grand jury's report, the article identified the plaintiff as one of three officers currently on the Danville police force who had been named as participants in the misconduct. The article also repeated the plaintiff's denial of any involvement in the burglaries.

Later articles written by defendant Carl Young referred to the presence on the Danville police force of three current officers who had been mentioned in the grand jury report as participants in the misconduct. The officers were not named in these articles, which appeared in The Commercial News on March 6, 10, 28, and 29, 1979. One of these articles concerned a statement made by Jack Roland that his grand jury testimony had not implicated any current officers; the other articles concerned the city's decision, as part of its investigation of the matter, to have polygraph tests administered to a total

of seven current police officers.

The plaintiff commenced this action on December 20, 1979; his second amended complaint comprises six counts, which are based on the articles in the six editions that we have described of The Commercial News. In each count the plaintiff alleged that the various statements concerning his alleged participation in the burglaries and thefts were false and that the defendants had acted with the actual malice required by the *New York Times* rule, that is, that the defendants had written and published the articles with knowledge of their falsity or with reckless disregard of their truth or falsity. The defendants moved for summary judgment, and the parties submitted a number of affidavits and depositions. The trial judge granted the motion, concluding that there were no facts that would support a finding of actual malice.

## II

■ As a preliminary matter, the plaintiff questions whether he should be considered a public official as that term is understood in the law of defamation. The plaintiff argues that his rank on the police force was not sufficiently high to qualify him as a public official under the standard expressed in *Rosenblatt v. Baer* (1966), 383 U.S. 75, 85, 15 L. Ed. 2d 597, 605, 86 S. Ct. 669, 676, where the court said that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." The plaintiff also relies on the suggestion made in *Hutchinson v. Proxmire* (1979), 443 U.S. 111, 119 n.8, 61 L. Ed. 2d 411, 421 n.8, 99 S. Ct. 2675, 2680 n.8, that not every public employee should be deemed a public official.

The United States Supreme Court has not had the occasion to decide whether a police officer of relatively low rank is a public official for purposes of defamation law. The plaintiff acknowledges, however, that Illinois courts have considered this question and have determined that a police patrolman is a public official. (See *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d 837; *Fogus v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1060, 444 N.E.2d 1100; *Angelo v. Brenner* (1980), 84 Ill. App. 3d 594, 406 N.E.2d 38.) *Coursey* was a decision by the Illinois Supreme Court, which we therefore are bound to follow. (*Rickey v. Chicago Transit Authority* (1983), 98 Ill. 2d 546, 457 N.E.2d 1.) In *Coursey* the court held that a city patrolman, though lowest in rank in the police department's hierarchy, was a public official within the scope of the *New*

*York Times* rule. A similar result must obtain here.

### III

As part of his cause of action, the plaintiff must prove that the allegedly defamatory statements were false. (*Garrison v. Louisiana* (1964), 379 U.S. 64, 74, 13 L. Ed. 2d 125, 132, 85 S. Ct. 209, 215.) In this connection, the defendants argue that the articles accurately summarized and interpreted the grand jury report and therefore were within the scope of the fair comment privilege. Because the alleged libel occurred in the way the newspaper construed a written document, our inquiry may be confined to the report itself in determining the accuracy of the statements and whether the privilege applies.

Under the fair comment privilege, " 'The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.' " (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 168, 419 N.E.2d 350, 360, quoting Restatement (Second) of Torts, sec. 611 (1977).) An accurate report is nonactionable unless the sole purpose in publishing it is to harm the person defamed by it. *Lulay v. Peoria Journal-Star, Inc.* (1966), 34 Ill. 2d 112, 214 N.E.2d 746.

The statements at issue here, purporting to relate the contents of the grand jury report, asserted that the plaintiff had been identified as a participant in the police misconduct that occurred in 1970 and 1971. The articles published in December 1978 mentioned the plaintiff by name as one of three police officers currently serving on the Danville police force who had been implicated in the investigation; articles published in March 1979, though without mentioning the plaintiff by name, repeated the reference to three current officers who had been implicated in the grand jury report. In contrast to those statements, the report itself contained only neutral references to the plaintiff. None of the witnesses mentioned him as a participant in any of the burglaries or thefts. His presence at two of the businesses that were broken into did not establish, imply, or suggest his complicity in the misconduct. We conclude that in describing the plaintiff—first by name and later by reference—as a participant in the burglaries and thefts, the defendants were not accurately reporting the contents of the grand jury report. Those statements were false summaries of the report and therefore were not within the fair comment privilege. *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350; Restatement (Second) of Torts sec. 611, comment *a* (1977).

## IV

█▄ █ We turn next to the question whether the trial court properly entered summary judgment on the issue of actual malice. As we have said, in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726, the Supreme Court held, as a matter of Federal constitutional law applicable to the States, that the first amendment to the United States Constitution "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Because the statements at issue here said that the plaintiff had been implicated in criminal conduct, they pertained to his fitness for office and therefore related to his official conduct. *Monitor Patriot Co. v. Roy* (1971), 401 U.S. 265, 277, 28 L. Ed. 2d 35, 44, 91 S. Ct. 621, 628.

█▄ █ The falsity of a statement does not by itself establish or state a cause of action for defamation; some degree of fault must be shown, even when the subject of the defamatory falsehood is a private individual as opposed to a public official or public figure. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 347, 41 L. Ed. 2d 789, 809, 94 S. Ct. 2997, 3010; see *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 162, 18 L. Ed. 2d 1094, 1115, 87 S. Ct. 1975, 1995 (Warren, C.J., concurring in result) (extending the *New York Times* rule to persons who do not hold public office but may be considered public figures).) As the malice requirement of the *New York Times* rule makes clear, a public official must prove that the false statement was the result of more than mere negligence. In attempting to define what is meant by the reckless disregard of the truth or falsity of a statement, the Supreme Court has said:

> "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325.

█ In an action for defamation, summary judgment may be granted for a defendant when the plaintiff's affidavits, depositions, and pleadings fail to raise a triable issue of fact. (*Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d

837; *Weber v. Woods* (1975), 31 Ill. App. 3d 122, 334 N.E.2d 857.) In *Hutchinson v. Proxmire* (1979), 443 U.S. 111, 61 L. Ed. 2d 411, 99 S. Ct. 2675, the Supreme Court questioned a Federal district court's suggestion that in applying the actual-malice standard of the *New York Times* case, summary judgment probably was the rule rather than the exception. The Supreme Court commented:

> "Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called 'rule.' The proof of 'actual malice' calls a defendant's state of mind into question, [citation], and does not readily lend itself to summary disposition. [Citations.] In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us." *Hutchinson v. Proxmire* (1979), 443 U.S. 111, 120 n.9, 61 L. Ed. 2d 411, 422 n.9, 99 S. Ct. 2675, 2680 n.9.

 █ With that *dictum* in mind, we conclude that summary judgment should not have been entered here. The pleadings, affidavits, and depositions before the trial court on the defendants' motion for summary judgment posed a triable issue of fact on the question of actual malice. We are mindful that at trial actual malice must be established with "convincing clarity." (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 285-86, 11 L. Ed. 2d 686, 710, 84 S. Ct. 710, 729.) That determination "is not merely a question for the trier of fact" and is subject to independent appellate review, for it is the presence of actual malice under the *New York Times* standard that deprives a defamatory statement of its constitutional protection. (*Bose Corp. v. Consumers Union of United States, Inc.* (1984), ___ U.S. ___, ___, 80 L. Ed. 2d 502, 523, 104 S. Ct. 1949, 1965.) Denominating the issue of actual malice, a question of fact may therefore be somewhat incomplete or misleading. See *Bose Corp. v. Consumers Union of United States, Inc.* (1984), ___ U.S. ___, ___ n.6, 80 L. Ed. 2d 502, 510 n.6, 104 S. Ct. 1949, 1954 n.6 ("In holding that there was a material issue of 'fact' (a label we use advisedly) on actual malice, the District Court ***").

The relevant documents may be recounted briefly. In moving for summary judgment the defendants relied, with respect to the question of actual malice, on the affidavits of defendant Bob Wilson and of Thomas J. Fahey, who was Vermilion County State's Attorney during the time of the investigation. Wilson, in his affidavit, declared that in conversations "immediately prior to the issuance of the [grand jury] report and for several days thereafter," he talked to Fahey and to Fahey's first assistant about the report and the officers named in it. Wil-

son went on to say that from these conversations he learned "that the officers named in the Grand Jury report were involved and/or participated in police burglaries which occurred in the early 1970's." Also in his affidavit, Wilson referred to the grand jury's finding that "[s]everal Officers having a knowledge of police misconduct and peripheral involvement therein are still employed as Danville Police Officers" and then said that at the time he wrote the articles he believed "that Michael Reed was in fact and in truth involved in the police burglary ring which was investigated by the Grand Jury." Fahey, in his affidavit, recalled making a statement to Wilson "to the effect that the parties named as participants in the criminal actions by the Grand Jury were participants ***."

Wilson's declaration of good faith does not preclude a finding of actual malice. The Supreme Court has said:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith." (*St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1326.)

Fahey's statement to Wilson that those named in the report as participants were indeed participants did not mean that everyone whose name appeared anywhere in the report was a participant. Fahey's statement showed only that he believed that the grand jury's findings were accurate, and it should not be interpreted to mean anything more than that those implicated in the report—"named as participants in the criminal actions"—were culpable.

In opposition to the defendants' motion for summary judgment, the plaintiff submitted excerpts from a number of depositions, including those of defendants Bob Wilson and Carl Young. Bob Wilson said in his deposition that when the newspaper appeared on December 21, 1978, he "wasn't particularly comfortable with the paper or with the pictures and the captions." He was referring to his own article on the grand jury investigation, with the accompanying photographs and captions; he did not know who had written the captions. Wilson said that his uncomfortable feeling related particularly to the plaintiff. Apart from obtaining comments on the story from various officials, Wilson said that he did not do any additional research before writing the December 23 article. That article also referred to the plaintiff, by name, as having been implicated in the investigation.

Defendant Carl Young, in his deposition, said that he "briefly"

read the grand jury report when it was released and then once again several days later. He also read Wilson's articles on the investigation, apparently as they were published. Young suggested that the plaintiff could have called the newspaper if he had a complaint about the articles.

An excerpt from the plaintiff's own deposition contained the information that on December 20, 1978, he received a telephone call from Wilson, who asked for his comments regarding the investigation. The plaintiff told Wilson that he had not taken part in the misconduct.

The plaintiff also submitted excerpts from the depositions of two of Wilson's editors, Les Smith and Randy Kirk, who had read the first article, apparently in draft form. Both Smith and Kirk had already read the grand jury report, and in vetting the article they relied on their memories of the report; they did not attempt a point-by-point comparison of the news article and the report. Neither Smith nor Kirk found any inaccuracies in the article. Kirk also said that the newspaper normally receives prompt complaints about serious mistakes in its stories. An excerpt submitted by the defendants from the plaintiff's deposition showed that the plaintiff did not immediately complain to the newspaper about the articles in question.

This information, coupled with the allegations in the complaint that the defendants had acted with actual malice, was sufficient to raise a triable question regarding the state of mind of the defendants. Wilson's statement in his deposition that he was uncomfortable with the paper, photographs, and captions when the newspaper appeared on December 21 tends to contradict the assertion of good faith that he made in his affidavit. And despite the uncomfortable feeling and the plaintiff's denial, Wilson repeated the statement regarding the plaintiff in a later article, without having done any further research. Young read both the report and Wilson's articles and repeated Wilson's reference to three current officers who had been implicated. The grand jury report was not confusing or ambiguous. (*Cf. Time, Inc. v. Pape* (1971), 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633.) In *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d 837, a newspaper article incorrectly reported that a municipal fire and police commission had found one of its police officers, the plaintiff, guilty of all the charges of misconduct that had arisen from an occurrence. Actually, the commission had not rendered a finding on the principal charge, making immoral suggestions to a teenaged girl, and the plaintiff sued for libel. The trial court granted the defendant summary judgment, but the supreme court held that

the plaintiff's allegations of actual malice, together with the article, which the complaint incorporated by reference, were sufficient to pose a triable question of fact and should have survived the motion for summary judgment. See *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350.

Therefore, we reverse the judgment of the trial court and remand the cause for further proceedings. Because of this result, we need not address the remaining issue raised by the plaintiff—whether newly discovered evidence required the court to vacate its order granting summary judgment.

Reversed and remanded.

GREEN and WEBBER, JJ., concur.