629 A.2d 965

Kelce MOSLEY, James M. Rizor, Lloyd A. Rohanna, Stephen C. Love and Robert Elliott, Individuals, Appellants,

v.

OBSERVER PUBLISHING COMPANY, A Corporation and David F. Pollock, Appellees.

Superior Court of Pennsylvania.

Argued April 14, 1993.

Filed Aug. 3, 1993.

Joseph J. Hinchliffe, Pittsburgh, for appellants.

Clarence A. Crumrine, Washington, for appellees.

Before WIEAND, POPOVICH and HESTER, JJ.

WIEAND, Judge:

In this action to recover damages for defamation, the trial court entered summary judgment against the plaintiff-public officials and in favor of the Observer Publishing Corporation, publisher of the *Observer–Reporter,* a daily newspaper of general circulation in Washington and Greene Counties. On appeal, we affirm. A public newspaper is privileged to publish information of public concern contained in an affidavit for search warrant so long as the report is fair and accurate.

In news stories appearing in editions of the *Observer–Reporter* on June 1, 1990, June 6, 1990 and June 12, 1990, there were reports of the annual audit of Greene County funds. Also appearing were stories about investigations being made by the District Attorney and Federal Bureau of Investigation into possible investment kickbacks and the issuance of search warrants to assist therein. Thus, the article of June 1, 1990, announced in its headline, "FBI, DA Probe Allegations of Investment Kickbacks", and the article, in pertinent part, reported as follows:

The FBI and Greene County District Attorney David F. Pollock are trying in investigating [sic] allegations that county officials received kickbacks from investments made with county money in 1988.

Information about the investigation was obtained by the *Observer–Reporter* from a search warrant issued by Pollock on April 6 for the county's financial statements for 1988.

The warrant was served on M. James Milinovich of Milinovich and Co Inc. Waynesburg which conducted the county's 1988 audit.

According to the search warrant, the county used money from the general fund account and "leveraged" or borrowed additional money to invest in U.S. Treasury bonds with values of either $1 million or $2 million. The bonds were traded daily on what is called "day trades," beginning Sep. 3, 1988.

Two unidentified investment experts hired by Milinovich, "are supposedly of the expert opinion" the county's transactions could have raised $225,000 in interest, the warrant states.

However, the county received only $25,000 and the remainder was paid in the brokerage firm for fees and commissions, it continues.

The district attorney's office and Federal Bureau of Investigation are acting "to determine whether or not any unlawful fees were paid back to county officials," the warrant states.

The second article was entitled, "Broker Says Day Trading on Investments Not Wise." The article reported on an interview conducted with a local broker who questioned the the prudence of day-trading U.S. Treasury securities by a county government. The article also repeated the investigation of "kickbacks" by county officials which had been contained in the District Attorney's search warrant.

The headline of the final article stated, "Controller: Commissioners Traded Bonds After Warning." This article was based on an interview with Greene County Controller John

Stets, who was quoted as stating that Greene County officials had agreed to stop day-trading U.S. Treasury securities with public funds in October of 1988 but that the trading had been resumed in February of 1989. This article also referred to the search warrant and the information contained therein.

Kelce Mosley, James M. Rizor, Lloyd A. Rohanna, who were county commissioners, and Stephen C. Love and Robert Elliott, who were county administrator and county treasurer respectively, filed a defamation action against the publisher and the District Attorney, David F. Pollock. Following extensive discovery, the trial court granted summary judgment in favor of the Observer Publishing Company, and the plaintiffs appealed.[1]

Summary judgment can properly be entered only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Curran v. Philadelphia Newspapers,* 497 Pa. 163, 177, 439 A.2d 652, 658–659 (1981). The motion for summary judgment has an important function in the context of a defamation case. This was recognized in *Washington Post Co. v. Keogh,* 365 F.2d 965 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), where the Court said:

> Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement.
>
> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the [*New York] Times [v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ] principle, in addition to protecting persons from being cast in damages in libel suits filed by

1. A judgment on the pleadings was entered by the trial court in favor of Pollock, and this was affirmed on appeal by the Superior Court. See: *Mosley v. Observer Publishing Co.,* 422 Pa.Super. 255, 619 A.2d 343 (1993).

public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government.... Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide open, for self-censorship affecting the whole public life is "hardly less virulent for being privately administered."

*Id.* at 968 (citations omitted).

■ "Upon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts of the executive or administrative officials of government." *Sciandra v. Lynett,* 409 Pa. 595, 600, 187 A.2d 586, 588 (1963). See also: *Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 324, 275 A.2d 53, 56 (1971). Because the privilege is a qualified one, however, it can be lost if the privilege is abused. *Sciandra v. Lynett, supra; Binder v. Triangle Publications, supra.*

If the newspaper account is fair, accurate and complete, and not published solely for the purpose of causing harm to the person defamed, it is privileged and no responsibility attaches, even though information contained therein is false or inaccurate. Further, it is not essential that the governmental proceedings or, as in this case, the official report, be set forth verbatim by the newspaper. A summary of substantial accuracy is all that is required.

*Sciandra v. Lynett, supra* 409 Pa. at 600, 187 A.2d at 588–589 (citations omitted). See also: Restatement (Second) of Torts § 611. In *Sciandra,* the defendant-newspaper had published a series of articles which identified the plaintiff as attending and participating in a "gangland" or "hoodlum" meeting in upstate New York. One of these articles recited that the plaintiff had been previously arrested on rape charges and that the plaintiff had a number of "reputed associates." The source of the articles was a public report authored by the New

York Commissioner of Investigation which detailed the history, activities, and associations of those who attended the meeting. The plaintiff sued, claiming that it was not true that he had a prior arrest for rape and that he had been defamed by the articles. Upon comparing the article to the public report, the Supreme Court concluded that the publication was privileged as "clearly a reproduction and/or fair account of what was said in the [report] itself." *Id.* 409 Pa. at 604, 187 A.2d at 591. With regard to the rape charge, the Court observed that the information, in fact, had been incorrect and the plaintiff obviously had been misidentified. Nevertheless, because the newspaper had merely quoted the report itself, the privilege had not been abused.

More recently, in *Oweida v. Tribune–Review Publishing Co.*, 410 Pa.Super. 112, 599 A.2d 230 (1991), *allocatur denied*, 529 Pa. 670, 605 A.2d 334 (1992), the Superior Court had occasion to reexamine the historical underpinnings of the so-called privilege of fair reporting and said:

The fair report privilege developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer. Pennsylvania had adopted the republication rule by the turn of the century, and no case brought to our attention suggests that Pennsylvania has abandoned it. With this rule, the law indulged the fiction that the republisher of a defamatory statement "adopted" the statement as his own. The common law regime created special problems for the press. When a newspaper published a newsworthy account of one person's defamation of another, it was by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true, a newspaper in these circumstances traditionally could avail itself of the truth defense only if the truth of the underlying defamation were established.

To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long

recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings the law abandons the assumption that the reporter adopts the defamatory remarks as his own.

*Id.* 410 Pa.Super. at 118–119, 599 A.2d at 234, quoting *Medico v. Time, Inc.,* 643 F.2d 134, 137–138 (3rd Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981) (footnotes omitted).

Three reasons have been advanced for the fair report privilege. *Medico v. Time, Inc., supra* at 140; Sowle, **Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report,** 54 N.Y.U.L.Rev. 469, 483 (1979). The first is the agency theory. The rationale of this theory is that the media serves as an agent for citizens who have a right to attend public meetings and inform themselves of what transpired. Secondly, the privilege acts as a supervisory function which recognizes both the public's duty to scrutinize official conduct and the security which publicity gives to the proper administration of justice. The final basis for the fair report privilege is the public's interest in being fully informed of important issues and controversies. *Medico v. Time, Inc., supra;* Sowle, *supra.*

█ This privilege extends to the publication of information contained in an affidavit and search warrant used by a district attorney in the investigation of possible misconduct by one or more county officials. Citizens are entitled to be informed regarding the management of tax dollars by public officials. A vigorous press plays a crucial role in advancing issues of public concern for the edification of the members of the public. This information may well be contained in affidavits supporting search warrants. As the Pennsylvania Supreme Court observed,

Public access to arrest warrant affidavits fosters important policy considerations, such as discouraging perjury, enhanc-

ing police and prosecutorial performance, and promoting a public perception of fairness in the arrest warrant process. *PG Publishing Company v. Commonwealth*, 532 Pa. 1, 5, 614 A.2d 1106, 1108 (1992).

That the fair report privilege extends to information contained in search warrants and affidavits for search warrants used in public investigations has been recognized by the courts of other jurisdictions. See: *Lavin v. New York News, Inc.*, 757 F.2d 1416 (3rd Cir.1985) (FBI affidavits accompanying application for search warrant); *Medico v. Time, Inc., supra* (FBI affidavits implicating elected official); *Seymour v. A.S. Abell Co.*, 557 F.Supp. 951 (D.Md.1983) (internal police investigation and administrative charges regarding alleged misappropriation of police property); *Pearce v. Courier–Journal*, 683 S.W.2d 633 (Ky.App.1985) (search warrant affidavit of drug enforcement officer); *Reed v. Northwestern Publishing Co.*, 129 Ill.App.3d 133, 84 Ill.Dec. 305, 471 N.E.2d 1071 (1984) (report summarizing testimony before and findings by grand jury). The privilege is also recognized by the Restatement (Second) of Torts § 611, comment d, which suggests that the privilege extends to *any* action taken by any officer of any State or any of its subdivisions.

██ The privilege is qualified, however, and can be forfeited if the report is inaccurate or unfair. *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1085 (3rd Cir.1988). In *Oweida v. Tribune–Review Publishing Co., supra*, the Superior Court set forth the standard for determining whether the fair report privilege has been forfeited. The court said:

> The question of whether the fair report privilege has been abused has been distilled by the federal courts to a "gist" or "sting" test. "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D.Pa.1983). The question is whether a reasonable person, comparing the complaint and the article as a whole, could conclude that the article was a fair and accurate

rendition of the complaint. If the reader could conclude that the article carries with it a materially greater "sting", then the fair report privilege has been abused and is thus forfeited. *See: Lavin v. New York News, Inc., supra,* 757 F.2d at 1419–1420. "An unfair summary in the present context is one that amplifies the libelous effect that publication of the government report verbatim would have on a reader who read it carefully—that carries a 'greater sting'." *Lavin v. New York News, Inc., supra,* 757 F.2d at 1426 (Becker, J., dissenting), *quoting Brown & Williamson Tobacco Corporation v. Jacobson,* 713 F.2d. 262, 271 (7th Cir.1983).

*Id.* 410 Pa.Super. at 129, 599 A.2d at 239.

In this case, the newspaper article contained no greater "sting" than the affidavit sworn to by District Attorney Pollock. The affidavit contained the following:

Your affiant is the District Attorney of Greene County. Affiant has received information from M. James Millinovich [sic], C.P.A. and Governmental Audit Director of Millinovich [sic] and Co., Inc., known personally by the affiant, that the County of Greene has levraged [sic] the general fund account in order to invest in U.S. Treasury Bonds with values of either one million or two million dollars and are traded daily. These transactions began on September 3, 1988. Two experts in the field of governmental investments were retained by M. James Millinovich [sic] and are supposedly of the expert opinion that the county's transactions would have raised some Two Hundred and Twenty–Five Thousand ($225,000.00) Dollars in interest; whereupon only one-ninth of the interest or approximately Twenty Five Thousand ($25,000) Dollars was actually paid to the County of Greene. The other eight-ninths of the investment would have been paid to a brokerage firm for fees and/or commissions.

Your affiant is acting in conjunction with the Federal Bureau of Intestigations [sic] to determine whether or not any unlawful fees were paid back to county officials.

A comparison of this affidavit with the news story published by the *Observer–Reporter* discloses that the newspaper accurately reported the averments of the affidavit without embellishment and without editorial comment. It reported, as recited in the affidavit, that an investigation was being made by the FBI and the District Attorney, that investment experts were of the opinion that Greene County's investments should have earned more income, that excessive brokerage fees may have been paid, and that inquiries were being made to determine whether unlawful fees had been paid back to county officials. Whether the averments in the affidavit were correct or incorrect, the newspaper was privileged to report the information contained therein. See: *Binder v. Triangle Publications, Inc., supra* at 326, 275 A.2d at 57; *Sciandra v. Lynett, supra* at 602, 187 A.2d at 589; *Oweida v. Tribune–Review Publishing Co., supra* at 128, 599 A.2d at 238; *DiSalle v. P.G. Publishing Co.,* 375 Pa.Super. 510, 541, 544 A.2d 1345, 1361 (1988), *allocatur denied,* 521 Pa. 620, 557 A.2d 724 (1989), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); Restatement (Second) of Torts § 611 comment a ("privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false."). Although the news articles may have contained a sharp "sting," it is clear that their "sting" or "gist" was no greater than the information contained in the search warrant itself.

Appellants argue that the privilege was abused because: (1) the reporter who wrote the story misconstrued the terms of the search warrant affidavit and failed to furnish Stephen Love, the county administrator, with a copy of the affidavit before asking him to comment; (2) the newspaper failed to investigate a possible link between the district attorney and a local banking family which was or may have been harmed by the day trading of Greene County investments; and (3) the newspaper failed to verify the facts before publishing the story. These factors, however, were insufficient to deprive the defendant newspaper of the privilege to report the investigation so long as it did so fairly and accurately. This is

so even if facts asserted in the search warrant affidavit were eventually shown to be inaccurate. *Sciandra v. Lynett, supra.* The investigation was undoubtedly a matter of great public concern, pertaining as it did to public funds and the conduct of public officials. The reporting thereof by the newspaper was determined by the newsworthiness of the story and not by any desire to harm county officials personally. Thus, the story is bereft of any suggestion of wrongdoing other than that contained in the affidavit for a search warrant to aid in the investigation. To hold that the defendant newspaper was liable for defamation damages under such circumstances would be to nullify the fair report privilege and impose a censorship which prevented the media from reporting investigations of public officials.

We hold, therefore, that the defendant newspaper was privileged to report fairly and accurately that information which was contained in an affidavit for a search warrant issued to aid the District Attorney in an investigation involving matters of public concern. That the privilege was not abused is so clear that reasonable minds cannot differ. Therefore, the trial court could properly enter summary judgment in favor of the defendant newspaper. See: *Lavin v. New York News, Inc.,*
*supra;* Restatement (Second) of Torts § 619(2), comment b.[2]

Judgment affirmed.

---

**2.** The defendant also raised a constitutional privilege under the United States Supreme Court decision in *New York Times v. Sullivan,* 376 U.S. 254, 279–280, 84 S.Ct. 710, 725–726, 11 L.Ed.2d 686 (1964) (constitutional guarantees prohibit public officials from "recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.' "). However, we need not address this issue, as we can decide the case on nonconstitutional grounds. *Binder v. Triangle Publications, Inc., supra* (where case decided on the basis of the fair report privilege it was unnecessary to reach the merits of the constitutional issue). See also: *Lavin v. New York News, Inc., supra* (3rd Cir.1985) (fair report privilege provides "extra layer" of protection to media defendants).