849 F.2d 876
 57 USLW 2022, 15 Media L. Rep. 1593
 Chang-Sin LEE, Plaintiff-Appellant,
v.
The DONG-A ILBO; Joong-Ang Ilbo; Cho-Sun Ilbo; The Korea
Herald; Central Virginia Educational Television
Corporation; The Sae Gae Shinbo, Inc.; The Korea Times,
a/k/a Han-Kook Ilbo, Defendants-Appellees.
 No. 87-2578.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 3, 1987.
Decided June 20, 1988.
Rehearing and Rehearing In Banc Denied Oct. 14. 1988.
 
 Steven Marc Schneebaum (Jonathan N. Halpern, Patton, Boggs & Blow, Washington, D.C., Larry Garber, Intern. Human Rights Group, on brief), for plaintiff-appellant.
 Thomas John Cawley (Stephen M. Sayers, Hunton & Williams, Fairfax, Va., on brief), Jack G. McKay, Alexandria, Va. (Keh Soo Park, Arlington, Va., on brief), for defendants-appellees.
 Before MURNAGHAN and ERVIN, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 ERVIN, Circuit Judge:
 
 
 1
 On September 9, 1985, two intelligence agencies of the South Korean government issued a sixty-two page "press release" announcing the disruption of two North Korean spy rings operating in the United States and West Germany. In Virginia, the defendants, six newspapers and one public television station, reported the announcement, essentially by repeating the story as reported in the Korean press. Plaintiff Chang-Sin Lee, a South Korean citizen living in New York, was identified in the accounts as a North Korean agent, and subsequently filed this libel action. The trial court granted summary judgment for the defendants based on the official report exception to the general rule of republication liability. Lee appeals. We reverse and remand.
 
 
 2
 Chang-Sin Lee immigrated to the United States in 1975 and is now a permanent resident alien. He graduated from Western Illinois University in 1984 and resides in New York City.
 
 
 3
 The press release was issued in South Korea by the National Security and Planning Agency and the Military Security Command, two South Korean intelligence agencies. It described the disruption of a student-run, North Korean spy ring operating in the United States at Western Illinois University. The announcement was widely publicized in South Korea.
 
 
 4
 The defendants subsequently reported the announcement, relying mainly on the accounts in the South Korean press. In fact, some of the defendants simply reprinted the story as it appeared in Korea, and the television station aired a rebroadcast from the Korean Broadcasting System. All but one of the stories were in Korean, and all were targeted at the Korean-American community.
 
 
 5
 The court below held that the official report privilege extends to the republication of all government reports, foreign and domestic. To overcome the privilege, a plaintiff must show malice. Because Lee could not show malice, the court granted the defendants' motions for summary judgment.
 
 
 6
 The issue on appeal is both novel and straightforward. Does the official report privilege apply to reports based on the acts of foreign governments? The privilege is largely a creation of state defamation law. All parties agree that the applicable law is that of Virginia, where the statements were made. The Supreme Court has not found the privilege to be of constitutional dimension. See Medico v. Time, Inc., 643 F.2d 134, 143-45 (3d Cir.1981). The Court, however, has recognized the existence of First Amendment considerations in the reporting of official actions. Id.; see Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (prohibiting criminal sanctions against publishers of information from confidential government proceedings); Cox Broadcasting v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (prohibiting invasion of privacy action for publication of public record--the name of a deceased rape victim); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (holding based on lack of actual malice). In Pape, the Court noted that "perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like." Pape, 401 U.S. at 286, 91 S.Ct. at 637. At least one lower court has taken this concern and created a constitutional privilege in the reporting of newsworthy events. Edwards v. National Audubon Society, 556 F.2d 113, 120 (2d Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).
 
 
 7
 Under the republication rule, one who repeats a defamatory statement is as liable as the original defamer. Medico, 643 F.2d at 137. The rule is based on the legal fiction that the republisher adopts the defamatory statement as his own. Id. The official or fair report privilege is an exception to the rule of republication liability. It is a privilege to publish accounts of public proceedings or reports despite their defamatory nature. Id.; Alexandria Gazette Corp. v. West, 198 Va. 154, 159-60, 93 S.E.2d 274, 279 (1956); Restatement (Second) of Torts Sec. 611.[1] Apparently, American courts have never considered whether the privilege applies to reports based on the acts of foreign governments, although at least one English court has addressed the issue.[2]
 
 
 8
 The rationales underlying the privilege are particularly important because of this lack of prior law. The courts cite three policy rationales to support the official report privilege: agency, public supervision, and the public's right to know. See Medico, 643 F.2d at 140-42; Webb v. Times Publishing, Inc., 2 Q.B. 535, 3 W.L.R. 352, 2 All E.R. 789 (1960). Under the agency rationale, a reporter acts as an agent for those who could inform themselves. Medico, 643 F.2d at 140-41. Here, the defendants reported summaries of the press release which was publicly available, at least in Korea.
 
 
 9
 The public supervision rationale is the idea that government should function openly with an eye toward its public responsibilities. Id. at 141. This rationale does not generally apply to the acts of foreign governments who are not accountable to the American people. It is arguable, however, that South Korea's position as an ally and foreign aid recipient creates an American public supervision interest, that Americans need to know about the activities of such governments in order to supervise our own government.
 
 
 10
 The informational rationale, or the public's right to know, focuses on the public's interest in important matters. Id. at 142. This is the most directly applicable rationale in the instant case, and the district court relied on it to apply the privilege. Americans in general, and Korean-Americans in particular, have a strong interest in learning of the disruption of a spy ring in the United States by an American ally, South Korea. Espionage in the United States is clearly a legitimate public concern.
 
 
 11
 Standing alone, an analysis of these policy considerations supports the extension of the official report privilege to reports of foreign government activities. The information was publicly available, so the agency rationale applies; the activities of an ally and foreign aid recipient arguably create a supervisory interest; and foreign espionage in the United States is important to the public. Other considerations, however, lead us not to extend the privilege in this case.
 
 
 12
 Three primary considerations weigh against extending the privilege. First, the rationales are not as persuasive in the context of foreign government activities. The informational rationale applies to all matters of importance no matter what their source, while the other rationales are less important when reports involve foreign governments. The agency rationale is weakened because the information here was available only in Korea. It was not readily available to those who chose to inform themselves, so the defendants were not acting as mere agents by reporting it. The public supervision rationale applies only indirectly. The American public cannot influence the Korean government directly, and cannot influence many foreign governments at all.
 
 
 13
 Second, we usually extend the privilege because of the nature of the relationship we share with our own government. We are familiar with the workings of our government and consider it to be open and reliable. We can also hold our own government accountable for its actions. Foreign governments, like nongovernmental sources of information, are not necessarily familiar, open, reliable, or accountable. Therefore, we think it unwise to provide a blanket privilege to those who report the activities of foreign governments.
 
 
 14
 Third, extending the privilege in a piecemeal fashion would be extremely difficult. Establishing criteria based on openness and reliability would be hard enough, but objectively applying the criteria would be nearly impossible. Reasonable persons could differ as to which governments, besides our own, exhibit the openness and reliability that warrant an extension of the privilege. Because negligence and falsity are part of a plaintiff's burden under Virginia law, it is unnecessary to extend the privilege any further. See Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 151, 334 S.E.2d 846, 852 (1985).
 
 
 15
 The dissent suggests making a case-by-case determination based on the importance of the information. There are several problems with this analysis.
 
 
 16
 First, the dissent places too much emphasis on the public's right to know and the importance of the defamatory information. While the "matters of public concern" are "at the heart of the First Amendment's protection," First Union National Bank of Boston v. Bellotti, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978), the State's interest in compensating private individuals for injury to their reputation remains strong and legitimate and must be balanced against the First Amendment interest. See Dun & Bradstreet, Inc. v. Greenmoss Builders, 472 U.S. 749, 757, 105 S.Ct. 2939, 2944, 86 L.Ed.2d 593 (1985). In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held that the fact that expression concerned a public issue did not by itself entitle the libel defendant to the constitutional protections of New York Times. Id. at 343, 94 S.Ct. at 3008. The Court allowed the plaintiff, who was a private figure, to recover actual damages so long as he was able to prove some fault on the part of the defendant, despite the public nature of the defamatory statement. Id. at 347-50, 94 S.Ct. at 3010-12. Likewise, the fact that the defamatory expression concerned a public issue should not entitle the defendant to the common law protection of the official reports privilege.
 
 
 17
 Second, the dissent's analysis would result in a blanket application of the privilege. The mere fact that the report was officially issued by a foreign government would give that report an imprimatur of "public interest." The reports of a foreign government will almost always be of great importance to some individual or some group in a heterogeneous society such as our own. In Webb, the court found that the information regarding the sexual liaisons of a married woman was deemed to be worthy of "public interest" status because the subject matter dealt with testimony that was given in a domestic criminal trial. Such a standard would lead to an unlimited application of the privilege while affording no protection to the defamed private person.
 
 
 18
 Third, proper attribution in the republication by itself would not necessarily discourage false or undeserved reliance on a foreign government's report. While most readers would be skeptical of reports issued by governments that are openly hostile to the interests of the United States or of Americans, they would be hard pressed to evaluate the reliability of reports issued by other allegedly "neutral" governments. We are unwilling to impute to most Americans sufficient knowledge with regard to the due process procedures of foreign courts or the accountability of foreign government agencies. Therefore, even with proper attribution, we are not willing to expand the applicability of the privilege.
 
 
 19
 We do acknowledge that not extending the privilege might have some chilling effect on newspapers and television stations. Without the privilege, they assume the risk that hastily gathered and promulgated information is incorrect. Mills v. Kingsport Times-News, 475 F.Supp. 1005, 1011 (W.D.Va.1979). Even mere negligence constitutionally can be the basis for liability when the defamed party is a private person, Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); The Gazette, Inc. v. Harris, 229 Va. 1, 15, 325 S.E.2d 713, 727 (1985), cert. denied sub nom., Fleming v. Moore, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). We believe, however, that the burden on the press here in verifying reports from foreign governments does not sufficiently differ in nature or scope from the burden it bears when it receives information from domestic non-official sources. Because we find that foreign governments are not necessarily more reliable than domestic non-official sources, we are not willing to enlarge the scope of the privilege to include information from such governments. Some countries may take advantage of our liberal First Amendment rights in order maliciously to defame or, carelessly and without adequate inquiry, excoriate private parties. In our opinion, therefore, the burden on the press is outweighed by the possible harm to the reputation of private persons.
 
 
 20
 Based on the preceding analysis of the official report privilege, its underlying rationales, and other considerations, we hold that the privilege does not apply to reports based on the press release issued by the South Korean government. So long as a plaintiff must prove falsity and negligence, it is unnecessary to extend the privilege any further. Summary judgment for the defendants based on the privilege was inappropriate, and the case is
 
 
 21
 REVERSED AND REMANDED.
 
 
 22
 FRANK A. KAUFMAN, Senior District Judge, dissenting:
 
 
 23
 For the reasons stated by Judge Ervin, I agree with the majority that it is "unwise to provide a blanket privilege to those who report the activities of foreign governments." Ante at 879 (emphasis added). However, while the issue certainly is a close one, in my view the recognition rather than rejection of a qualified privilege would strike a more appropriate balance between the need to protect an individual's reputation and the American public's need to have knowledge of the acts of foreign governments. Accordingly, I dissent from the majority's reversal of the district court's grant of summary judgment. For the reasons stated in Part II of this opinion, I would, however, remand for further proceedings concerning plaintiff's claims against the seven defendants to determine whether proper attribution was made by each of them.
 
 I.
 
 24
 The majority states that courts should not involve themselves in assessing the reliability and openness of the operations of a foreign government in order to determine whether, in a given case, the fair report privilege should apply. I agree that courts should always keep that problem in mind. But that does not necessarily mean that courts are not fully capable of assessing the importance of a particular publication to a particular audience. By relying on that criterion, courts would be able to extend the privilege on a case-by-case basis as the need arises. As the current lack of case law in this area indicates, the issue of the fair report privilege in the foreign government context would hardly appear to arise often enough to make a case-by-case application unduly burdensome. Such an ad hoc approach is not new to defamation law; for example, application of the public figure doctrine presents "a question of law to be resolved by the court" in each case in which the issue is present. Dameron v. Washington Magazine, Inc., 779 F.2d 736, 740-43 (D.C.Cir.1985),cert. denied, 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). See also id. at 740-43.[1]
 
 
 25
 As Judge Ervin has written, ante at 878, there are "three policy rationales [which] support the official report privilege: agency, public supervision, and the public's right to know." In a given context, one of those rationales may well be given more weight than the others. See Medico v. Time, Inc., 643 F.2d 134, 142 (3d Cir.), cert. denied, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981); Note, Privilege to Republish Defamation, 64 Colum.L.Rev. 1102, 1102 (1964). In this case, as the majority opinion suggests, see ante at 7, the importance of the public supervision rationale does not loom too large. However, at least in the United States, the fact that citizens in one state have no direct ability to supervise state governmental activity in another state apparently does not affect the application of the official report privilege when the report, although issued by the government of the first state, is republished in the second state. Also, as the success of many international human rights groups demonstrates, the importance of indirect supervision, i.e., public pressure, is a factor to be considered. With regard to the agency rationale, its importance per se is questionable whenever the government report is not available for public inspection, whether the government be our own or foreign. See, e.g., Medico, 643 F.2d at 140-41 & n. 23 (discussing the inapplicability of the agency rationale in a case involving republishing of secret FBI report); see also Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 149 A.2d 193, 205-06, 209 (1959) (concerning the republication of secret U.S. Senate proceeding).
 
 
 26
 Because the agency and public supervision rationales are less important in a case such as this one, it is the third factor, the public's right to know, which requires the most attention. The majority asserts that the privilege should not be extended to reports of foreign governments because those governments are "not necessarily familiar, open, reliable or accountable." Ante at 879. Presumably, the reports issued by those governments are not sufficiently trustworthy, and, therefore, a greater risk of defamation inheres in publishing them. However, that risk alone should not outweigh the public's interest in the dissemination of that information. See Note, supra, at 1109, 1112, 1115. The majority seems to relate the extent of that risk to the conclusion that the American reading public will assume that the official reports of such unreliable governments are trustworthy. While that assumption may sometimes be well-grounded, it would seem quite likely that many American readers will often tend to discredit whatever a foreign government has to say when that government is perceived in this country as not treating its citizens fairly by American standards. Also, as discussed in Part II infra, in a case in which the qualified privilege is otherwise available the requirement of proper attribution will inform the reader of the source of the information.
 
 
 27
 I agree with the majority that courts in the United States should try to avoid becoming involved in determining whether a given foreign government is open and reliable enough to warrant extending the privilege to the republication of a press release of that government. Such an inquiry could well implicate the credibility of the foreign government and its agencies. Cf. Webb v. Times Publishing Co., Ltd., [1960] 2 Q.B. 535, 563. If a qualified privilege is recognized and the major criterion for its application depends upon the importance of the publication to the American reader, a court may have to walk a very thin line in order to avoid violating principles of comity. But, in any event, a complete refusal to recognize the privilege will not solve the problem entirely. For if the qualified privilege is held not available as a matter of law or, under the standards suggested by this dissent, is determined not to be applicable in a given case, then, as Judge Ervin has noted, ante at 879, under Virginia law the burden will be on the plaintiff to prove falsity. That will require a given plaintiff not only to engage in pretrial discovery with regard to the issue of falsity, but, if trial is held, will cause that plaintiff to try to prove that the foreign government's report was false.[2] And, in a jury trial, that inquiry may be more difficult to control than an inquiry made by the court under the standard and procedure discussed in this dissent.
 
 
 28
 Webb v. Times Publishing Co., Ltd., [1960] 2 Q.B. 535 provides a framework for analyzing the public interest issue. Cynthia Webb, the plaintiff, was the former wife of Brian Hume. In 1950, Hume was tried in a British court for the murder of Stanley Setty. Webb testified on Hume's behalf at the trial, and in the course of so doing she stated that she had never met the murder victim. 2 Q.B. at 537. Hume was subsequently acquitted of the murder charge, although he pleaded guilty to a lesser offense. Id. at 538. In 1959, Hume was again put on trial for a different murder, this time in Switzerland. During the Swiss trial, Hume testified that, although he and Webb were married at the time of the first trial and had had a child, the father of that child was actually Stanley Setty, the murder victim involved in the previous case. Id. at 537-38. An account of the Swiss trial, including the verbatim testimony concerning the relationship between Setty and Webb, was subsequently published in England by the defendant newspaper. Webb sued for defamation, claiming that a reader of the newspaper's account of the Swiss trial would conclude that she had not only committed adultery with Setty but also had perjured herself at the British trial by testifying that she had never met Setty before. Id. at 538-39.
 
 
 29
 In its defense, the defendant newspaper argued that a blanket common law official report privilege protected its publication of the account of the Swiss trial, but that, in any event, a qualified privilege existed with respect to the particular facts in Webb. Id. at 553. After reviewing the five justifications commonly given for the privilege, see id. at 559-61,[3] Justice Pearson focused upon the need for the court to engage in a "balancing operation" in which the court "balanc[es] the advantages to the public of the reporting of judicial proceedings against the detriment to individuals of being incidentally defamed." Id. at 561. He noted that judicial proceedings in certain countries were not as fair or reliable as those in England, that such proceedings were sometimes subject to propagandist abuse by the governments of some countries, and that those two considerations increased the risk that incidental defamation would occur. Id. at 562. Justice Pearson concluded that, in terms of a blanket privilege, the differences between foreign and British judicial proceedings were great enough that the risk of an individual being incidentally defamed outweighed the public benefit resulting from the reporting of that proceeding in England. Id. But, continued Justice Pearson, in some circumstances the British public interest might well justify the reporting of a foreign judicial proceeding and the application in such a case of the defense of privilege, despite the incidental risk of defamation. See id. at 563-65.[4] In such circumstances, it is not the presence or absence of the foreign government's reliability which should control the applicability, vel non, of the privilege. See id. at 563; see also note 5, supra. Instead,
 
 
 30
 [o]ne has to look for a legitimate and proper interest as contrasted with an interest which is due to idle curiosity or a desire for gossip. There is not necessarily anything wrong in newspapers publishing news items which appeal only to idle curiosity or the desire for gossip. But, if they do so, there is not in the subject-matter any such legitimate and proper interest as is needed to confer privilege for an incidental defamation that may be involved.
 
 
 31
 There is thus a test available for deciding whether the subsect-matter is appropriate for conferring privilege. A report of the decision of the United States Supreme Court on an important question of commercial law has legitimate and proper interest. On the other hand, a report of a judicial proceeding wholly concerned with an alleged scandalous affair between Mrs. X and Mr. Y is unlikely to have such interest and is likely to appeal only to idle curiosity or a desire for gossip.
 
 
 32
 Webb, 2 Q.B. at 569-70 (emphasis added). In stating those extremes, Judge Pearson recognized that future cases might well involve subject matter of varying degrees of importance between such extremes. See id. at 570.
 
 
 33
 The majority opinion states that the burden of proving the falsity of the report's content and negligence in its publication, which Virginia law imposes upon a plaintiff, adequately protects media defendants' First Amendment rights. Ante at 879. That may well be an important consideration in certain types of defamation situations. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775-78, 106 S.Ct. 1558, 1563-65, 89 L.Ed.2d 783 (1986). In a given case, both plaintiff and defendant may find it equally difficult to obtain access to the facts necessary to establish the truth or falsity of the information contained in the republished report of a foreign government. But in a case such as this, when the media party is relatively small,[5] it may not have the financial or logistical wherewithal to confirm the accuracy of the information in the report.[6] Or, at the very least, it may not be able to do so with the speed necessary to make the publication of the report meaningful to its readership.[7] In the heat of the moment, faced with the prospect of potentially devastating lawsuits on the one hand and the difficulty of confirming a story's accuracy on the other, the media party may not find much comfort in the fact that, if the case goes to trial, the plaintiff may not be able to prove falsity.[8] On balance, media defendants, especially the smaller ones which are targeted to specific audiences, may all too often decide not to publish.[9] As a result, certain segments of the American public--such as the Korean-American public in this case--will be deprived of access to information of great importance to them.[10] Under the circumstances, I conclude that this is the type of case in which a qualified privilege for the fair republication of an official report of a foreign government should exist and be applied, subject only to the reservations stated in Part II of this opinion.
 
 II.
 
 34
 There is a factual dispute as to whether some of the newspaper articles properly attributed the story to the two Korean agencies which issued the press release. To establish their right to rely on the qualified fair report privilege, appellees must establish (1) that the South Korean press release is an official report; (2) that it contains defamatory statements; (3) that the subject matter of the release is of public concern; (4) that an appellee's account of the press release is fair and accurate; and (5) that the media properly attributed the source of the report. See Restatement (Second) of Torts Sec. 611 (1977).[11]
 
 
 35
 All but one of these five requirements are met in this case. First, because the press release was issued by two agencies of the South Korean government, it appears clear that the press release is an official report. See Medico, 643 F.2d at 139-40; Hughes v. Washington Daily News Co., 193 F.2d 922, 923 (D.C.Cir.1952). Second, none of the parties appears to deny that the allegations contained in the release would be defamatory if proved at trial to be false. Third, for the reasons discussed by the majority and in Part I of this dissent, and as recognized by the district court, the subject matter of the report is of public concern. Fourth, appellant conceded in the district court that the various appellees' accounts of the press release's contents constitute impartial and accurate summaries of the press release. App. 54-55, 61, 62; see Mills v. Kingsport-Times News, 475 F.Supp. 1005, 1011 (W.D.Va.1979) (describing requirement of accurate summary under Virginia law). There is, however, an open issue, one apparently not specifically addressed by the district court: whether, with respect to each article, each of the appellees properly attributed the report to the Korean governmental agencies which issued it.
 
 
 36
 The issue of fair attribution is generally a question for the fact-finder; in the case at bar, that would be the jury, as plaintiff has prayed a jury trial. See Lavin v. New York News, Inc., 757 F.2d 1416, 1420 (3d Cir.1985). The attribution requirement is not met, and therefore the privilege will not attach, if
 
 
 37
 the report is written in such a manner that the average reader would be unlikely to understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding. It must be apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings.
 
 
 38
 Dameron, 779 F.2d at 739 (emphasis added).
 
 
 39
 The attribution requirement is especially important in the context of the republication of the official reports of foreign governments because the proper attribution of such a report will tend to decrease the risk of incidental defamation. As Judge Mikva noted in Dameron:
 
 
 40
 [If there is no proper attribution,] the reader is left with the impression that the conclusion is that of the article's author based on his own research--which may or may not have included government reports. Had the author attributed the report to its source, the reader would know that he was simply being informed of the [government agency's] view and could then evaluate the statement accordingly. The defamatory potential of an unattributed statement of what is apparently an accepted fact presents a far different situation.
 
 
 41
 779 F.2d at 740 (emphasis added).
 
 
 42
 The record discloses that appropriate attribution is present with respect to the CVETC news broadcast and the articles published by the Korea Herald and the Sae Gae Times.[12] As for the news stories carried by the Dong-A Ilbo, the Hankook Ilbo, the Joong-Ang Ilbo, the Cho-Sun Ilbo, and the Korea Times, the appellees appear to admit that these articles contained no specific attribution. See Appellees' Br. at 27. Accordingly, whether or not attribution is revealed by the overall context of the articles in question, see Dameron, 779 F.2d at 739, is a factual issue which not only has not been addressed by the district court but cannot, in any event, be determined by this court in the light of the record before us. Therefore remand to the district court for further proceedings as to the question of attribution concerning these four appellees[13] would be needed if the qualified privilege approach set forth in Part I of this dissent were subscribed to--as it is not--by the majority.[14]
 
 
 
 [1]
 Sec. 611. Report of Official Proceeding or Public Meeting. The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported
 
 
 [2]
 Webb v. Times Publishing Co., 2 Q.B. 535, 3 W.L.R. 352, 2 All E.R. 789 (1960). In Webb, the court made a limited extension of the privilege to protect the reporting of a Swiss judicial proceeding involving an English citizen. The court emphasized the nature of the activity, a judicial proceeding, which has far more reliability than the press release of an intelligence agency. Still, the court refused to invoke a blanket privilege for all foreign judicial proceedings. The court found the report to be privileged, however, based on the legitimate and proper interest the English public had in it
 
 
 [1]
 In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), a private figure case, Justice Powell expressed concern about forcing state and federal judges to decide on an ad hoc basis which publications address issues of "general or public interest". Id. at 346, 94 S.Ct. at 3010; see also id. at 345-46, 94 S.Ct. at 3009-10. However, in Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), another private figure case, Justice O'Connor focused on the importance of the information being published. See id. at 774-78, 106 S.Ct. at 1562-65. Also, in his plurality opinion in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), Justice Powell discussed whether the information was of public or private concern. See id. at 761-63, 105 S.Ct. at 2946-47. And, in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), Justice White wrote: "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. at 1690. Connick involves free speech in the employment context, not defamation. However, Justice White's language in Connick was quoted with approval by Justice Powell in Dun & Bradstreet, 472 U.S. at 461, 105 S.Ct. at 2946, itself a defamation case. Thus, the Supreme Court has indicated that there may be occasions in the area of defamation law when a court needs to make determinations pursuant to a criterion of the type set forth in this dissent
 
 
 [2]
 See the discussion on the issue of burden of proof in the majority opinion, ante at 879
 
 
 [3]
 Those reasons are: (1) the fact that court proceedings were open to the public; (2) that the administration of justice concerns all persons; (3) that the public should be educated about how justice is administered; (4) that even defamed persons may "be better off with fair and accurate reports than with rumours [sic] circulating," and (5) that the balancing of interests justified the extension of the privilege. Concluding that the first four of these reasons had very little force in the context of foreign judicial proceedings, see 2 Q.B. at 559-61, Justice Pearson emphasized the applicability of the fifth reason
 
 
 [4]
 In so holding, the British court relied on the proposition that the status of the governmental body issuing the report was not conclusive, citing Perera v. Peiris, [1949] A.C. 1 (P.C.). Perera involved an appeal to the British Privy Council from the then-British colony of Ceylon concerning a report issued by the government of Ceylon. The report was based on testimony taken in camera by a government commission investigating an alleged bribery scandal within the Ceylon government, and was reprinted in the Ceylon Daily News. The plaintiff, who had testified in the in camera proceedings, was described in the report as " 'completely lacking in frankness,' " [1949] A.C. at 17, and subsequently sued the newspaper for libel. The Privy Council noted that a qualified privilege of fair report existed under the applicable Roman-Dutch law, which was quite similar to British law in this area, id. at 19-20, and concluded that the Ceylon public had a great interest in the contents set forth in the government's report. Id. at 21-22. As in this case, the press release in Perera referred to a non-public proceeding
 
 
 [5]
 The following information about the media appellees would appear relevant. The public television station, WNVC-TV, is owned by appellee CVETC. CVETC is a non-profit, noncommercial public station based in Falls Church, Virginia, with an approximate viewership of less than 19,000 persons. See App. 81K, 127. WNVC-TV's multi-language programming serves many ethnic communities in the metropolitan Washington, D.C. area
 By contrast, the newspaper appellees specifically target their publications at the Korean-American public. The Sae Gae Times is a weekly English-language publication printed exclusively in the United States. The remaining appellees, although United States corporations, republish daily Korean language editions of major Korean daily newspapers for circulation in the United States. The Korean Herald is a two-person office and employs no reporters or editors. See App. 199. The record does not clearly indicate the size of the other appellees.
 
 
 [6]
 The record discloses that at least two of the appellees simply did not have the resources necessary to confirm the accuracy of the press release. See App. 200, 218. Appellee Sae Gae Times, which comes out weekly, tried to verify the story, but by the time of publication, was only able to contact one of the persons mentioned in the story. See App. 274-75. That appellee subsequently did manage to get in touch with appellant and printed appellant's denial of the espionage charges. See App. 275
 
 
 [7]
 The publisher of the Korean Times, which also republishes the Hankook Ilbo in the United States, testified during his deposition about the complaints received from the Hankook Ilbo's readership when stories from Korea are not reprinted as quickly as possible. App. 205
 
 
 [8]
 See ante at 879
 
 
 [9]
 By the terms of their publishing contracts, several of the appellees seemingly must either reprint verbatim a given edition of the Korean newspaper from which they receive their information, or cannot under the terms of the contract reprint anything at all. See App. 197, 205-06, 208-09, 220, 222. If by the terms of those contracts appellees may not eliminate articles the accuracy of which they cannot confirm, a choice not to reprint an official governmental report may of necessity prevent the republication of other nondefamatory information as well
 
 
 [10]
 Indeed, the record reflects that this was the express opinion of at least two of the appellees. See App. 264, 294. Furthermore, the story seemingly was of special interest to those persons with connections to Western Illinois University, where appellant was a student during the time the espionage ring was allegedly active
 
 
 [11]
 While the Restatement, as well as some cases, see, e.g., Lavin v. New York News, Inc., 757 F.2d 1416, 1420 (3d Cir.1985), perhaps fuse together the separate requirements of accurate reporting and proper attribution, or apply balancing considerations, other cases suggest that each of these two requirements may stand on its own feet and be independent of the other, and that a defendant claiming the privilege must prevail separately as to each requirement. See Dameron, 779 F.2d at 739; see also, e.g., Curtis Publishing Co. v. Vaughan, 278 F.2d 23, 28-29 (D.C.Cir.), cert. denied, 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960); Hughes v. Washington Daily News Co., 193 F.2d 922, 923 (D.C.Cir.1952) (citing state cases and terming issue "well-settled"). The latter view would appear preferable in the context of this case when one keeps in mind the closeness of the underlying issues involved
 
 
 [12]
 The CVETC broadcast was given by an employee of the Korean Broadcasting System, the state-sponsored television station in South Korea. In the course of summarizing the press release, the announcer specifically referred to the National Security and Planning Agency and the Military Security Command by name, and stated that these agencies had issued a "special announcement" about the student spy ring and had "released" information pertaining to the incident. See App. 182-83 (translation of broadcast)
 The Korean Herald, which prints its stories in English, published two related articles as well as an editorial. The articles, the basis for appellant's claim against this appellee, were on the same page and are clearly related. See App. 79-80. One of the articles begins: "The Agency for National Security Planning (NSP) and the [Military] Security Command Monday accounced a crackdown.... The announcement said...." The other article had a headnote beginning: "Following are summaries of activities by key members of the two espionage rings cracked down on by the [Korean government agencies]." See id.
 Similarly, the Sae Gae Times published a synopsis of the press release as well as several related articles. The articles' source is specifically labelled as a "Release by the National Security Planning Agency and the [Military] Security Command of Korea." App. 252.
 
 
 [13]
 There are four rather than five appellees because the Korea Times is responsible for both its own publication and that of the Hankook Ilbo. See note 7, supra
 
 
 [14]
 If there were such a remand and, if on remand, it were determined, either by the district court on a motion for summary judgment or by the jury at trial, that the remaining four appellees properly attributed the source of their articles, then the privilege would shield these four appellees from liability and would entitle them to judgment. That result would follow because, as the majority opinion states: "To overcome the [official report] privilege, a plaintiff must show malice." Ante at 877. In this case, appellant does not contend that appellees have acted with the common law malice necessary to destroy the privilege under Virginia law. See Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, 727 (1985), cert. denied sub nom. Fleming v. Moore, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 843 (1985) and Port Packet Corp. v. Lewis, 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985)