Howard FRIEDMAN, Plaintiff,

v.

ISRAEL LABOUR PARTY, Haim Ramon, David Libai, Moshe Shahal, Tova Elinson, Globe Newspaper Company, Jerusalem Post Publications, Ltd., and John Does I–XV, jointly and severally Defendants.

Civil Action No. 96–CV–4702.

United States District Court,
E.D. Pennsylvania.

March 25, 1997.

B. John Bialecki, Jr., Stevens and Bialecki, Philadelphia, PA, for Plaintiff.

Carl A. Solano, Schnader Harrison Segal & Lewis, Philadelphia, PA, Jonathan M. Albano, Laura A. Clark, Bingham, Dana & Gould LLP, Boston, MA, for Globe Newspaper Co.

Andrew A. Chirls, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, PA, Victor A. Kovner, Edward J. Klaris, Lankenall-Kovner and Kurtz, New York City, for Jerusalem Post Publications, Ltd.

### *MEMORANDUM AND ORDER*

YOHN, District Judge.

Plaintiff, a resident of Pennsylvania, has filed this defamation claim against the Israel Labour Party ("ILP"), four of its members individually, the Globe Newspaper Company ("Globe"), Jerusalem Post Publications ("Post"), and assorted John Does. Plaintiff alleges that the Labour Party and its members defamed him when they issued a press release which announced that the Israeli Government had barred plaintiff and six other Americans from entering the state of Israel ("Count II"). Plaintiff also alleges that Globe and Post defamed him when they published in their respective newspapers news reports discussing the Israeli press release and plaintiff's suspension by the Israeli Government ("Count I").

Globe and Post ("defendants") now seek dismissal of plaintiff's Count I claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, or, in the alternative, pursuant to Fed.R.Civ.P. 56 for summary judgment claiming that the suit is barred by Pennsylvania's fair report privilege. Globe also claims that the suit is barred by the "wire service" defense and by lack of personal jurisdiction. The court agrees with Globe and Post and believes that Pennsylvania's fair report privilege protects defendants' news reports of the Israeli press release. For this reason, the court will GRANT defendants' motions for summary judgment.

### I. BACKGROUND [1]

Jerusalem Post Publications, Ltd., ("Post") is a New York corporation which publishes The Jerusalem Post, International Edition, the English-language international edition of The Jerusalem Post, a newspaper in Israel. Complaint ¶ 8. Globe Newspaper Corporation ("Globe") is a Massachusetts corporation which publishes the newspaper, The Boston Globe. Complaint ¶ 7. Plaintiff Howard Friedman is a Philadelphia, Pennsylvania resident. Complaint ¶ 1.

On approximately December 20, 1995, shortly after Prime Minister Yitzhak Rabin was assassinated, and in conjunction with the Minister of Justice, defendant David Libai, and the Minister of Public Security, defen-

---

1. The facts are derived from plaintiff's complaint, the parties' motion papers, and the following affidavits submitted by the parties and considered by the court: 1) Globe's Godfrey Kauffman Affidavit (describing Globe's circulation in Pennsylvania); 2) Globe's Phillip Bennett Affidavit (describing Globe's reliance on a Reuters dispatch, and noting that as a participant in the writing of the article, Bennett "never had heard of [plaintiff] Howard Friedman ... [and] know[s] of no one on the Globe staff who knows Mr. Friedman or has any feelings of ill will or dislike toward him"); 3) Post's Kovner Affidavit (attaching as exhibits various newspaper articles about plaintiff including an article in the Jewish Exponent where plaintiff described himself as being proud to be banned by the state of Israel); and, 4) Plaintiff's Friedman Affidavit (stating that he does not "support illegal and violent activity ... [has] no criminal background ... planned no illegal activities in Israel [and] was never liable to endanger state security in Israel or elsewhere."). Therefore, the motion will be treated by the court as a motion for summary judgment. *See Rose v. Bartle*, 871 F.2d 331 (3d Cir.1989).

dant Moshe Shahal, the Interior Minister of the Israeli Government, defendant Chaim Ramon, through his spokesperson, Tova Elinson, issued the following press release:

Interior Minister Chaim Ramon decided to act on his authority according to the Law of Return and Law of Entry Into Israel, to prevent entry into Israel and/or immigration approval to

Mark Blaustein--U.S. citizen . . .

Howard Friedman--U.S. citizen . . .

Hal Blaustein, U.S. citizen, resident of Philadelphia

Michell Benvenisti--U.S. citizen . . .

*The four are associated with planning illegal activities in Israel.*

George Mostanza--U.S. citizen . . . , resident of New York State. He is an activist in the J.D.L. organization which supports illegal and violent activity.

Rabbi Abraham Hecht-rabbi of the Halav congregation in New York, U.S. citizen. . . . [H]e made a proposal to declare Prime Minister Rabin z"l a "moser" whom one is permitted to kill. After the murder of Rabin he repeated his opinion in an interview with the press.

Bizad Cohen--U.S. citizen, Los Angeles resident. He supports extremist organizations, outlawed in Israel.

Minister Ramon's decision was taken when it became known that *the above persons either have a criminal background which might endanger public peace or are liable to endanger state security.*

The Interior Minister sent an announcement of his decision to Foreign Minister Ehud Barak, and to Chairman of the Jewish Agency, Avraham Burg, and requested that they be prepared accordingly.

Kovner Aff. Exh. B (emphasis added).

On December 30, 1995, The Jerusalem Post, International Edition published an article entitled *7 U.S. Extremists Denied Entry.* The Post's article reads as follows:

Interior Minister Haim Ramon . . . issued an order barring the entry into Israel of seven U.S. citizens involved in extreme right-wing activity. . . .

This is the second time since Rabin's assassination that such an order has been issued. Ehud Barok, when he served as interior minister, barred entry to a right-wing activist whose name was not released. Ramon was acting under authority granted

him by [the laws of Israel], ministry spokesman Tova Elinson said. None of the persons barred has requested a visa.

Some of the persons barred have criminal records and pose a threat to the public. . . . Others are considered a threat to Israel's security. Ramon informed Foreign Minister Barak and Jewish Agency Chairman Avraham Burg of the decision, Elinson said. But Burg last week requested a clarification from Ramon, describing the step as unusual. . . .

Four other persons were barred for "being involved in planning illegal activities in Israel." They were identified as Mark Blaustein, 27, and his brother, Hal, a resident of Philadelphia,; Howard Friedman, 37, and Michell Benvenisti,48. Elinson said all had been members of the Jewish Defense League.

*7 U.S. Extremists Denied Entry,* The Jerusalem Post, International Edition, Dec. 30, 1995.

The Boston Globe published a similar article on December 21, 1995. It was entitled *Israel, In Crackdown, Bars Entry to 7 U.S. Jews as Security Risks.* That article reads as follows:

Israel barred entry yesterday to seven American Jews including a New York rabbi who were considered a security risk by officials still reeling from the assassination last month of Prime Minister Yitzhak Rabin. . . .

The ministry said the six others [including plaintiff] had been linked to illegal activities in Israel, had backed extremist groups outlawed in Israel or been active in the Jewish Defense League founded by Meir Kahane, the slain anti-Arab New York rabbi. . . .

"All of these people have a criminal past, could endanger the public order or endanger national security," Interior Minister Haim Ramon said. As a result they would be barred from entering or receiving immigrant status, he said.

Accused of planning illegal activities in Israel were Mark Blustein, born 1968,

Howard Friedman, born 1958, Hall Blustein of Philadelphia, Pa., and Michael or Michelle Benvenisti, born 1947....

Named as a supporter of extremist organizations outlawed by Israel was Cohen Bizad of Los Angeles.

"The files of these people were considered over a long period by security officials and the state prosecutor who unanimously recommended I exercise my authority," Ramon told Israeli Radio.

Israeli officials pledged to crack down on Jewish extremists following the Nov. 4 assassination of Rabin by Yigal Amir, a religious Jew opposed to Israel's handing over control of West Bank land to Palestinians.

Within days of the assassination the Interior Minister put into effect a policy banning Jews identifying with Jewish terrorist groups, announcing it would prevent the entry of an activist in Kahane's Kach movement, which is outlawed in Israel.

*Israel, In Crackdown, Bars Entry to 7 U.S. Jews as Security Risks,* The Boston Globe, Dec. 21, 1995.

Shortly after he was banned from Israel, in an interview with the Jewish Exponent, plaintiff declared: " 'I'm very, very proud' to be banned.... 'I agree with their decision to ban me.... I would be nothing but trouble to them—my presence.' " *Banned and Proud of It,* Jewish Exponent, Dec. 29, 1995. Further, plaintiff stated that the ban was a sign that he had been " 'chosen by God,' " and that he " 'was very, very happy to hear that [Prime Minister Yitzhak] Rabin was assassinated (and) even happier' to learn an Israeli Jew did it." *Id.*

On July 1, 1996, plaintiff filed the instant complaint alleging that "[o]n or about December 20, 1995, defendant Ramon, under directions, advice and agreement of, and/or ratification by, and ultimately on behalf of defendants Libai, Shahal, John Does I through XV and Israel Labour Party, issued [the press release] wherein he banned Plaintiff's, [sic] along with six others', [sic] future entry into Israel and stated, inter alia, that 'all of these people have a criminal past,

could endanger the public order or endanger national security.' " Complaint ¶ 13.

In Count I of the complaint, plaintiff claims that these "statements were republished, in print by defendants Globe and Post," Complaint ¶ 15, with the intent "to injure the Plaintiff and to deprive him of his good name, credit and reputation, ... [by] falsely, maliciously and/or negligently ... imputing upon him illegal, criminal and immoral activities." Complaint ¶ 22. Claiming this republication of the "wholly false and defamatory statements" was the cause of "severe distress, psychological and emotional injury, lost business and business opportunity, lost familial relations, lost religious relations, receipt of numerous and anonymous harassing phone calls, and threats against his life," Complaint ¶ 39, plaintiff requests over ten million dollars in compensatory and punitive damages from Globe and Post.[2]

After filing the complaint, plaintiff served Post and Globe, who subsequently filed, with affidavits, their respective "Motions to Dismiss or, in the Alternative, for Summary Judgment." Plaintiff's responses with affidavits and defendants' replies thereto were later received by the court. No other briefs or affidavits have since been supplied by the parties or considered by the court.

## II. *Standard*

If matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment, provided all parties have the appropriate opportunity to respond. *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989); Fed. R.Civ.P. 12(b).

Summary judgment is appropriate if the admissible evidence presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.1995) (citing *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)). "All inferences must be drawn in favor of the nonmoving party, all doubts must be resolved

2. In Count II, plaintiff makes the same claims and requests against the Israel Labor Party,

Haim Ramon, David Libal, Moshe Shahal, Tovah Elinson, and John Does I–X.

against the moving party, and all allegations of the nonmoving party that conflict with those of the movant must be taken as true." *McKinney v. West End Voluntary Ambulance Ass'n,* 821 F.Supp. 1013, 1017 (E.D.Pa. 1992). The moving party carries the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In turn, the nonmoving party cannot rely on the allegations contained in the complaint. Instead, the nonmoving party must offer specific facts indicating that a genuine issue for trial exists. *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party "cannot ... rely merely upon bare assertions, conclusory allegations or suspicions." *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981); Fed.R.Civ.P. 56(e). If there are no genuine issues as to material facts, the court must determine whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *Discussion*

### A. *Personal Jurisdiction*

■ Where a court is asked to rule on a combination of Rule 12 defenses,[3] it should pass on the jurisdictional issues first.[4] Plaintiff bears the burden of demonstrating that the defendant has contacts sufficient with the forum state to provide in personam jurisdiction. *See Compagnie des Bauxites de Gui-*

nee v. L'Union, 723 F.2d 357 (3d Cir.1983). Generally, when, as here, the pleading and affidavits are relied upon to meet this burden the plaintiff succeeds by establishing a prima facie showing of facts supporting jurisdiction. *See Pennebacker v. Wayfarer Ketch Corporation,* 777 F.Supp. 1217, 1219 (E.D.Pa.1991). Factual discrepancies created by affidavits are generally resolved in favor of the nonmoving party. *See id.*

■ To determine whether a court has personal jurisdiction over a defendant, it is necessary to examine the relevant statutes of the forum state.[5] The Pennsylvania Long Arm Statute allows a court to exercise jurisdiction over a person "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." *Time Share Vacation Club v. Atlantic Resorts, Ltd.* 735 F.2d 61, 63 (3d Cir. 1984). Thus, the reach of the Pennsylvania statute is coextensive with the due process clause of the United States Constitution. *See id..*

Under the due process clause, a court may not exercise personal jurisdiction over a nonresident defendant unless there are certain minimum contacts between the defendant and the forum. *See Calder v. Jones,* 465

---

**3.** In addition to requesting a dismissal on the merits under Rule 12(b)(6) and/or Rule 56, Globe also requests a dismissal for lack of personal jurisdiction under Rule 12(b)(2):

The Globe has a circulation of fewer than twenty-five copies in Pennsylvania. Kauffmann Affidavit, ¶ 3 and Exhibit A thereto. The Globe does not advertise in Pennsylvania, has no property or offices there, has no news bureau there, has no appointed agent for service of process, bank accounts, or telephone listing in Pennsylvania. *Id.* at ¶ 2. In short, the Globe does not have sufficient minimum contacts with Pennsylvania to subject it to the jurisdiction of this court.

Globe's "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" at 14.

**4.** [A] defendant may join objections to jurisdiction under Rule 12(b)(2) with a motion to dismiss for failure to state a claim or any other defenses that are assertable by motion without waiving the jurisdictional defense.... As a general rule, when the court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass

on the jurisdictional issues before considering whether a claim was stated in the complaint.

5A C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d* § 1351, at 243–244. *See also Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir.1963) ("Not only does logic compel initial consideration of the issue of jurisdiction over the defendant-a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim-but the functional difference that flows from the ground selected for dismissal likewise compels considering jurisdiction and venue questions first. A dismissal for lack of jurisdiction or improper venue does not preclude a subsequent action in an appropriate forum, whereas a dismissal for failure to state a claim upon which relief can be granted is with prejudice.").

**5.** Rule 4(e) of the Federal Rules of Civil Procedure permits a district court to assert personal jurisdiction over a nonresident to the extent allowed under the law of the state where the district court sits. *See Fed.R.Civ.P. 4(e).*

U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In order for a nonresident defendant to be constitutionally subject to the jurisdiction of this court, it must have purposefully availed itself of the privilege of acting within the forum state. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

In *Proctor & Schwartz v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 323 A.2d 11 (1974), the Pennsylvania Supreme Court established a tripartite analysis to determine whether sufficient contacts are present for the exercise of specific jurisdiction: [6]

> First, the defendant must have purposefully availed itself of the privilege of acting within the forum state thus invoking the benefits and protections of its laws.... Second, the cause of action must arise from defendant's activities within the forum state.... Lastly, the acts of the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over it reasonable.

*Id.*

The touchstone of *Proctor's* first prong is whether the "defendant's conduct and connection with the forum state are such that he should *reasonably* anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (emphasis added); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779, 104 S.Ct. 1473, 1480–81, 79 L.Ed.2d 790 (1984) (The function of

the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum state.).

In *Gordy v. The Daily News*, 95 F.3d 829, 831 (9th Cir.1996), a case similar to this one,[7] the Ninth Circuit concluded that the defendant New York Daily News, which had published a column allegedly defaming plaintiff and had distributed from 13 to 18 copies of its newspaper in California, had sufficient minimum contacts with California to support the exercise of personal jurisdiction there. *See id.* Although the Ninth Circuit recognized that the New York Daily News' circulation within California was quite small, the court nonetheless believed that jurisdiction was proper because the defendant had purposefully availed itself of or "targeted" the plaintiff and California. Of particular importance to the Ninth Circuit, besides the fact that defendant had regular subscribers in California, was the fact that 1) the defendant knew that plaintiff was a California resident when it wrote its allegedly defamatory article; 2) the purpose of the article was to report on plaintiff and his California activities, and 3) the bulk of the harm from the defamation occurred in California, the place of plaintiff's domicile. *See id.*

Recognizing Supreme Court precedent, the Ninth Circuit refused to focus solely on the small circulation of the Daily News in California and refused "to adopt a de minimis rule regarding newspaper publication that requires distribution considerably in excess of 13 to 18 copies to permit specific jurisdiction." *Id* at 833 (citing *Calder v. Jones*, 465

---

**6.** Personal jurisdiction may be established by either demonstrating that the cause of action arose specifically from defendant's particular activities within the forum state ("specific jurisdiction") or that defendant engaged in "continuous and systematic" contacts with the forum state, Pennsylvania ("general jurisdiction"). *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539 (3d Cir.1985); *Pennebacker v. Wayfarer Ketch Corp.*, 777 F.Supp. 1217, 1220 (E.D.Pa.1991). Considering the few contacts Globe has with Pennsylvania, it is clear that only specific jurisdiction is at issue in this case.

**7.** From a legal standpoint, *Gordy* is similar because like Pennsylvania, California's long arm statute reaches to the constitutional limits of the

due process clause and the California courts have iterated the same three requirements for determining whether a non-resident defendant may be subjected to specific jurisdiction. *Compare Proctor & Schwartz v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 323 A.2d 11 (1974) *with Data Disc, Inc. v. Systems Technology Assocs., Inc.* 557 F.2d 1280, 1287 (9th Cir.1977). From a factual standpoint, *Gordy* is similar because it presents a situation where, as here, defendant's regular conduct and connection with plaintiff's state was sufficient to confer jurisdiction even though that conduct and connection was small, i.e., defendant circulated under twenty copies of its publication there.

U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) ("[P]etitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.")[8] and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780–81, 104 S.Ct. 1473, 1481–82, 79 L.Ed.2d 790 (1984) (finding publisher capable of being sued in a forum where "only a small portion" of its copies were distributed)).[9]

■ In this case, Globe's actions were also targeted at Pennsylvania. Globe's article was about plaintiff and six others, three of whom are residents of Pennsylvania; Globe knew when it allegedly defamed plaintiff that at least one of the targets of the article lived in Philadelphia, Pennsylvania;[10] because there were only seven people mentioned in the article, Globe had good reason to expect that a substantial impact of its allegedly defamatory article would be felt in Pennsylvania where the article was distributed, *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780, 104 S.Ct. 1473, 1481, 79 L.Ed.2d 790 (1984) (noting that it is reasonable to expect the bulk of the harm from defamation of an individual to be felt at his or her domicile); and Globe serves subscribers in Pennsylvania, though they are few.[11] Under *Proctor's* first prong, Globe purposefully availed itself of Pennsylvania.

■ As for *Proctor's* second prong, there is little doubt that plaintiff's claim arises out of defendants' forum-related activities. In this case, the important forum-related activity was the circulation in Pennsylvania of an allegedly defamatory column, the effect of which was felt in Pennsylvania, plaintiff's home state.

■ As for *Proctor's* third prong, once the court has decided that Globe has the requisite minimum contacts and that plaintiff's claim arises out of them, Globe must show that the exercise of jurisdiction over it is unreasonable.[12] Here, Globe can make no such showing. Globe knew that some of the article's targets lived in Pennsylvania when Globe allegedly defamed plaintiff and Globe should have expected that the article's negative impact would largely be felt in Pennsylvania, *see Keeton*, 465 U.S. at 780, 104 S.Ct. at 1481; Globe regularly serves subscribers in Pennsylvania; and, litigating in Philadelphia, Pennsylvania is not unreasonably far from Globe's home in Boston, Massachusetts. Thus, Globe cannot make a compelling case that litigating in this forum would render jurisdiction unreasonable.

In sum, by publishing an allegedly defamatory article the effects of which would clearly be felt in Pennsylvania, and by regularly circulating newspapers in Pennsylvania, Globe purposefully availed itself of the privilege of conducting activities in Pennsylvania. Plaintiff's claim arises from those activities. Globe has not made a compelling case that litigating in Pennsylvania would be unreasonable. Thus, Globe's 12(b)(2) motion to dismiss for lack of personal jurisdiction will be denied.

### B. Fair Report Privilege

■ Under the common law republication rule, one who repeats a defamatory state-

---

**8.** In *Calder*, the National Inquirer's 600,000 circulation in California was not "mere untargeted negligence" but was "intentional ... expressly aimed at California" and therefore sufficient for jurisdiction there. *Calder*, 465 U.S. at 790, 104 S.Ct. at 1487–88.

**9.** In *Keeton*, defendant's regular distribution of 10,000 Hustler magazines in New Hampshire was a sufficient connection to New Hampshire even though neither defendant nor plaintiff had any other connection there. *See Keeton*, 465 U.S. at 780–81, 104 S.Ct. at 1481–82.

**10.** The Globe article expressly identifies Hal Bluestein "of Philadelphia, Pa." *Israel, in Crackdown, Bars Entry to 7 U.S. Jews As Security Risks*, The Boston Globe, Dec. 21, 1996.

**11.** The court cannot determine the exact number of subscriptions Globe has in Pennsylvania. Globe's affidavits show that the total number of its Pennsylvania subscriptions is less than twenty-five.

**12.** The consideration of reasonableness here duplicates the analysis that led the court to conclude that Globe had purposefully availed itself of Pennsylvania. This duplication is inevitable because under *Proctor's* first prong, contacts with Pennsylvania are sufficient if they "are such that he should *reasonably* anticipate being haled into court there." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567 (emphasis added).

ment is as liable as the original defamer. This rule is based on the legal fiction that the republisher adopts the defamatory statement as his or her own. However, the official or fair report privilege is an exception to the rule of republication liability. It is a privilege to publish accounts of public proceedings or reports despite their defamatory nature. *See Mosley v. Observer Publishing Co.*, 427 Pa.Super. 471, 629 A.2d 965 (1993) (finding that newspaper was privileged to report fairly and accurately information which was contained in a search warrant); *Oweida v. Tribune–Review Publishing Co.*, 410 Pa.Super. 112, 599 A.2d 230, 233 (1991).[13]

■ Pennsylvania has long recognized a privilege for the press to publish accounts of official proceedings or reports even when they contain defamatory statements. *See, e.g., Medico v. Time*, 643 F.2d 134, 137 (3d Cir.1981) (finding that Time magazine's republication which summarized FBI surveillance reports was protected under Pennsylvania's fair report privilege); *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963) (finding that a newspaper's republication of Governor's report on organized crime was within the ambit of the privilege and not an abuse of that privilege). So long as the press report presents a fair and accurate summary of the proceedings, *see Williams v. WCAU–TV*, 555 F.Supp. 198, 201 (E.D.Pa.1983); *Sciandra*, 187 A.2d at 587; Restatement (Second) of Torts, § 611 (1977), and the account was not published solely for the purpose of causing harm to the person defamed, *see Sciandra*, 187 A.2d at 588–89 (Pa.1963); *but see* Restatement (Second) of Torts, § 611 (1977) (making no reference to the "solely to harm" requirement), it is privileged and no responsibility attaches, even though information contained therein is false or inaccurate. It is not essential that the governmental proceedings or the official report be set forth verbatim by the newspaper. A summary of substantial accuracy is all that is required. *See Sciandra*, 187 A.2d at 587; Prosser, Torts § 95 (2d Ed.1958); Restatement (Second) of Torts, § 611 (1977). A statement is substantially accurate if its "gist" or "sting" is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced. *See Williams*, 555 F.Supp. at 201.

■ The existence and breadth of the privilege concerning reports of official or judicial proceedings are matters of law appropriate for summary disposition. *See Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir.1981); *Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406 (E.D.Pa.1978). Further, summary judgment is appropriate where the record contains no evidence from which a jury might find that a defendant abused the privilege and where there is no genuine issue of material fact as to the substantial accuracy of the report. *See Mathis*, 455 F.Supp. at 415.

1. *Does the Privilege Apply to Foreign Government's Actions?*

Globe and Post assert that they are entitled to summary judgment because the material facts show that their newspaper articles about plaintiff were fair and accurate reports of official action by the Israeli government and thus protected under Pennsylvania's fair report privilege. However, their claim that the articles were fair and accurate and therefore privileged puts the cart before the horse and overlooks the threshold issue in this case: Whether Pennsylvania's fair report privilege even applies to news reports based on the official acts of *foreign* governments?

**13.** "The common law regime created special problems for the press. When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true, a newspaper in these circumstances traditionally could avail itself of the truth defense only if the truth of the underlying defamation were established. To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements." *Oweida v. Tribune–Review Publishing Co.*, 410 Pa.Super. 112, 599 A.2d 230, 233 (1991).

In light of this novel question,[14] plaintiff urges the court to refuse to apply Pennsylvania's fair report privilege to news reports based on official acts of foreign governments. Defendants counter that a refusal to recognize and apply the privilege to foreign governments, even a qualified privilege,[15] would be contrary to precedent and public policy. After examining prior Pennsylvania case law on the fair report privilege, the Restatement (Second) of Torts, § 611 (1977) and the policy rationales which have traditionally supported application of the privilege, the court agrees with defendants and concludes that under Pennsylvania law there exists and should be applied here a qualified privilege for the fair republication of official acts of foreign governments. Recognition of a qualified fair report privilege strikes the most appropriate balance between the need to protect an individual's reputation and the American public's need to have knowledge of the acts of foreign governments.

a). *Pennsylvania Case Law*

[11, 12] Pennsylvania case law provides very little guidance on whether the fair report privilege applies to news publications based on foreign government actions. In *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586 (1963), Pennsylvania's seminal fair report case, the Supreme Court of Pennsylvania was asked to rule upon whether a study commissioned by the Governor of New York was an "official act" sufficient to fall within the protections of the privilege. Stating the privilege in broad terms, and including the report as official action covered by the privilege, the court declared: "Upon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts [including commission reports] of the executive or administrative officials of government." *Id.*, 187 A.2d at 588.

In *Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir.1981), the Third Circuit, analyzing Pennsylvania case law, held that Pennsylvania's fair report privilege applied to a Time magazine article which fairly and accurately summarized an FBI investigatory tape implicating the defendant with the Mafia. Relying on the Restatement (Second) of Torts, § 611 (1977), the court noted that FBI materials were "official" in nature since the agents who compiled them were acting within the scope of their appointed duties. *Id.* at 140.

Like *Sciandra*, *Medico* focused primarily on the type of action taken, and whether news coverage of the action was fair and accurate, not on the status of the governmental body that took the action. *See Webb v. Times Publishing Co., Ltd.*, 2 Q.B. 535, 563 (1960) (citing *Perera v. Peiris*, A.C. 1 (P.C. 1949)). Thus, neither case is particularly helpful in determining whether the privilege applies to press releases of foreign governments. The same holds true for the other Pennsylvania cases cited by defendants in support of the proposition that Pennsylvania's fair report privilege has been or should be expanded to include defendants' news reports of the Israeli press release. *See, e.g., Lal v. CBS*, 726 F.2d 97 (3d Cir.1984) (videotaped interviews with witnesses supplementing news broadcast of judicial proceeding within privilege); *Williams v. WCAU–TV*, 555 F.Supp. 198 (E.D.Pa.1983) (police reports of physical arrest of criminal suspects within privilege).

14. Only one federal court appears to have ruled on this issue expressly. In *Lee v. Dong–A Ilbo*, 849 F.2d 876 (4th Cir.1988), in a divided opinion, the Fourth Circuit held that the press release of two South Korean intelligence agencies reporting the involvement of a South Korean citizen-New York resident in a North Korean spy ring, and six newspapers' republication of that release, was not covered by the official report exception to the general rule of republication liability. *Id.*

In *Sharon v. Time, Inc.*, 599 F.Supp. 538, 542–43 (S.D.N.Y.1984), the court stated in dicta that with regard to plaintiff Sharon's suit against Time for republishing an Israeli Commission's conclusion that Sharon was responsible for a Beirut massacre, Sharon "did not base his suit on the overall thrust of Time's critical article, *most of which is absolutely protected* either as opinion or as the fair report of a judicial proceeding." *Id.* (emphasis added).

15. A qualified privilege in this context would be one determined on a case-by-case basis as opposed to a blanket or per se privilege which would apply regardless of the facts of the particular case.

### b). *The Restatement*

The Restatement (Second) of Torts does not shed much light on the subject either.[16] The Restatement reads as follows:

s 611 REPORT OF OFFICIAL PROCEEDING OR PUBLIC MEETING

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts, § 611 (1977).

Further, comment (d) states:

d. Official proceedings. The privilege covered in this Section extends to the report of any official proceeding, or any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions. Since the holding of an official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken. The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege....

The privilege is further applicable to the report of any official proceeding or action of either house of Congress of the United States or the legislative body of a State or the municipal council of a city, town or village. It is also applicable to public proceedings and actions of other bodies or organizations that are by law authorized to perform public duties, such as a medical or bar association charged with authority to examine or license or discipline practitioners.

It is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law.

Restatement (Second) of Torts, § 611 comment (d) (1977).

Thus, to the exclusion of news reports of *foreign* government actions, the Restatement and its comments focus on news reports of the actions of federal, state and local governments. Whether this focus is purposefully meant to exclude the reports of official acts of foreign governments or whether it is merely the result of the fact that issues involving foreign governments have never before been raised (and therefore cannot be "restated" in the Restatement) is unclear.

### c). *Policy Justifications for the Privilege*

Although Pennsylvania case law on the fair report privilege and the Restatement (Second) of Torts are neutral on this issue, the policy rationales historically used to justify application of the privilege support the conclusion that a qualified privilege for the fair republication of official acts of foreign governments exists under Pennsylvania law and should be applied here.

Two rationales have traditionally been offered as justification for the existence of the fair report privilege. The one most often articulated is that accounts of official acts-trials, legislative and executive proceedings, and the like—provide information that is of such interest to the general public as to override the interest of the individual in preserving his privacy or reputation. *See Sciandra*, 187 A.2d at 589. This public interest rationale has been broken down into two subcategories: the supervisory interest and the informational interest.

The supervisory interest represents the benefit to the public, in terms of effective self-government, of exposure to and information about the conduct of government. *See Medico*, 643 F.2d at 141. Accordingly, the privilege acts to protect the publication of

---

16. "Unlike many states, Pennsylvania has never codified the fair report privilege. In addition, while Pennsylvania follows the Restatement (Second) of Torts on most matters, the Pennsylvania Supreme Court evidently has not yet had occasion to comment on the Restatement's version of the fair report privilege.... We believe it appropriate to accept as the law of Pennsylvania the version of the fair report privilege embodied in the current Restatement." *Medico*, 643 F.2d at 138.. The Third Circuit's prediction that the Pennsylvania Supreme Court will adopt the Restatement on this issue is, of course, binding on this court.

information that promotes the ability of the public to oversee government. Justice Holmes, applying the privilege to accounts of courtroom proceedings, gave the classic formulation of this principle:

> (The privilege is justified by) the security which publicity gives for the proper administration of justice. . . . It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884). The supervisory rationale has been invoked in the context of executive action as well. *See* Note, *Privilege to Republish Defamation*, 64 Colum. L.Rev. 1102, 1108 (1964).

The other subcategory of the public interest rationale, the information interest, applies to matters covered by the privilege because of their educational value. Protection of this interest, in combination with the supervisory interest, explains why the privilege attaches to an account of a government report about a subject unconnected with government processes or procedures. Judge Pearson, in *Webb v. Times Publishing Co.*, 2 Q.B. 535 (1960), gave the classic formulation of this principle:

> [o]ne has to look for a legitimate and proper interest as contrasted with an interest which is due to idle curiosity or a desire for gossip. There is not necessarily anything wrong in newspapers publishing news items which appeal only to idle curiosity or the desire for gossip. But, if they do so, there is not in the subject-matter any such legitimate and proper interest as is needed to confer privilege for an incidental defamation that may be involved.

There is thus a test available for deciding whether the subject-matter is appropriate for conferring privilege. A report of the decision of the United States Supreme Court on an important question of commercial law has legitimate and proper interest. On the other hand, a report of a judicial proceeding wholly concerned with an alleged scandalous affair between Mrs. X and Mr. Y is unlikely to have such interest and is likely to appeal only to idle curiosity or a desire for gossip.

*Webb*, 2 Q.B. at 569–70; *see Medico*, 643 F.2d at 141 ("A third rationale for the fair report privilege rests . . . on the public's interest in learning of important matters."); *Sciandra*, 187 A.2d at 587–88 ("Upon the theory that it is in the public interest that information be made available as to what takes place in public affairs, a newspaper has the privilege to report the acts of the executive or administrative officials of government.").[17]

A second rationale for the fair report privilege is known as the agency rationale. According to the agency rationale, the publisher of an account of an open proceeding should not be liable for what members of the public saw, or could have seen, for themselves. Under the agency rationale, a reporter acts as an agent for those who could inform themselves. *Medico*, 643 F.2d. at 140–41; *Curry v. Walker*, 126 Eng. Rep. 1046 (C.P.1796) (finding it not unlawful to publish "a true account of what took place in a court of justice which is open to all the world" on the theory that because a member of the public could have witnessed the defamation, he or she is entitled to be informed by it).

These rationales loom large in the present case. The public supervision rationale applies because, as has often been stated, the United States maintains a "unique" relationship with Israel, historically one of the United States' allies and recipient of a substantial amount of the United States' foreign aid. News reports of actions of the Israeli government help American citizens oversee the policy of the United States toward Israel, and of

17. Some jurisdictions rely on the informational rationale to extend the privilege to accounts of proceedings of public meetings of private, nongovernmental organizations, as long as the meeting deals with matters of concern to the public. *See, e.g., Pinn v. Lawson*, 72 F.2d 742 (D.C.Cir. 1934) (meeting of parish church board); *Borg v. Boas*, 231 F.2d 788, 794–94 (9th Cir.1956) (meeting calling on judge to convene grand jury).

Israel itself. The effect of this transnational supervision is arguably similar to the effect of the supervision that citizens in one state exert over citizens of a different state, and the publication of a different state's official reports in a second state is protected by the fair report privilege. *See Lee,* 849 F.2d at 880 (Kaufman, J., dissenting). In addition, as the success of many international human rights groups and the United Nations demonstrates, indirect supervision, i.e., public pressure, can play a large role in the affairs of foreign governments. *See id.*

Closely connected to the supervisional rationale, the informational rationale, or the public's interest in learning important matters, also applies in this case. Information concerning a United States citizen who is allegedly planning "illegal activities in Israel" is of legitimate and significant interest to the American public. Such information is neither "idle gossip," nor scandalous information, *Webb v. Times Publishing Co., Ltd.,* 2 Q.B. 535 (1960), but important public security information conveyed to an audience eager to absorb it. *See Medico,* 643 F.2d at 142; Note, *Privilege to Republish Defamation,* 64 Colum. L.Rev. 1102, 1108–09 (1964) ("Such matters as public security, health, education, morality, economy or corruption are of legitimate public concern.").

With regard to the agency rationale, it too supports the existence and application of a qualified fair report privilege here. Although the statements by Tova Elinson and the Israeli government's press release were available for public inspection to anyone in the world, most people chose to rely on the international press to disseminate the information worldwide.[18]

The recognition and application of the fair report privilege to foreign governments is appropriate for another reason as well. The absence of the fair report privilege would effectively stand international news reporting on its head. Without the privilege, the news media who report international news would find it incredibly difficult, if not impossible, to publish reports of official acts of foreign

governments without subjecting themselves to intolerable defamation liability. As Judge Kaufman predicted:

> [A media party] may not have the financial or logistical wherewithal to confirm the accuracy of the information in the report. Or, at the very least, it may not be able [to confirm the accuracy of the report] with the speed necessary to make the publication of the report meaningful to its readership. In the heat of the moment, faced with the prospect of potentially devastating lawsuits on the one hand and the difficulty of confirming a story's accuracy on the other, the media party may not find much comfort in the fact that, if the case goes to trial, the plaintiff may not be able to prove falsity. On balance, media defendants, especially the smaller ones which are targeted to specific audiences, may all too often decide not to publish. As a result, certain segments of the American public ... will be deprived of access to information of great importance to them.

See *Lee,* 849 F.2d at 883–84 (Kaufman, J., dissenting); *Medico,* 643 F.2d at 137; *Oweida v. Tribune–Review Publishing Co.,* 410 Pa.Super. 112, 599 A.2d 230, 233 (1991).

Recognizing the fair report privilege therefore allows the news media to continue to cover international stories without the fear of overwhelming defamation liability and also ensures that media markets, large and small, will continue to be provided with access to important international news and information.

#### d). *Potential Problems With The Court's Analysis*

Of course, the court's recognition and application of a qualified fair report privilege raises some problems. One potential problem is that in practice it could lead to all reports based on the acts of foreign governments being protected. As the court in *Lee* recognized, a *qualified* privilege could turn into a *blanket* privilege because "[t]he mere fact that the report was officially issued by a

---

**18.** The Israeli government's actions were reported by, among others, the defendants, the *New York Daily News,* the *Ethnic Newswatch,* the *To-* *ronto Star* and the *Jewish Exponent. See* Kovner Aff. Exh. F.

foreign government would give that report an imprimatur of 'public interest' " and would "almost always be of great importance to some individual or some group in a heterogeneous society such as our own." *Lee*, 849 F.2d at 879. As such, such a standard could "lead to an unlimited application of the privilege while affording no protection to the defamed private person." *Id.*

However, the *Lee* court places undue emphasis on this problem. An ad hoc factual approach which involves a court's assessing the public's interest in particular defendants' news reports will not necessarily lead to blanket application of the privilege. Courts have proved quite adept at engaging in this type of analysis, especially in the area of defamation law. Application of the public figure doctrine, for example, requires the court to engage in a similar analysis and determine whether the information conveyed was of a public or private concern. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (focusing on the importance of the information being published); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (discussing whether the information was of public or private concern).

Another potential problem is that the court did not engage in an examination of the openness and reliability of the Israeli government, and therefore, the court does not know if the official proceedings in Israel were as fair or as reliable as those in our country. Although this may be a serious problem if and when the situation involves a dictatorship or a nondemocratic government,[19] this case raises no such concerns. By everyone's standards, Israel is an open and reliable democracy and there is no indication that the Israeli government's purpose in banning the plaintiff was to defame him.

A final potential problem is that any examination into the legitimacy of the public's right to know by one court could be different from an examination by another court and could lead to both unpredictable results and an explosion in litigation. However, this problem is unlikely to be significant because, like most factual determinations, there should evolve over time a pattern which will guide courts in resolving the most difficult decisions. Further, "[a]s the current lack of case law in the area indicates, the issue of the fair report privilege in the foreign government context would hardly appear to arise often enough to make a case-by-case application unduly burdensome." *Lee*, 849 F.2d at 880 (Kaufman, J., dissenting).

### e). *Conclusion*

In sum, for the reasons outlined above, the court concludes that in this case defendants' republication of the Israeli press release falls within the ambit of Pennsylvania's fair report privilege.

### 2. *Were the Articles Fair and Accurate?*

Of course, the court's determination that the defendants' publications are generally protected by Pennsylvania's fair report privilege does not end the inquiry. The defendants are entitled to summary judgment only if they can show that they have not forfeited the privilege.

In *Sciandra v. Lynett*, 187 A.2d at 589, the court set forth the standard for determining whether the fair report privilege has been forfeited. The court said:

> [The immunity] is forfeited if the publisher steps out of the scope of the privilege or abuses the "occasion." This can be done by exaggerated additions, or embellishments to the account. Furthermore, this qualified privilege is lost if the defamatory material is published solely for the purpose of causing harm to the person defamed.

*Id.*

Here, there is no evidence in the record which raises a genuine issue of material fact concerning defendants' abuse of the privilege. In particular, there is no evidence in the record to support plaintiff's contention that the broadcast was made *solely* for the purpose of harming him. Defendants Post

---

19. Dictatorships or non-democratic governments could "take advantage of our liberal First Amendment rights in order maliciously to defame or, carelessly and without adequate inquiry, excoriate private parties." *Lee*, 849 F.2d at 879.

and Globe have each offered affidavits revealing that their purpose in producing and disseminating the press release was to document a news story, not to injure plaintiff. *See* Kovner Aff. Exh. F. (revealing that many press institutions reported on the ban and noting that the article focused on seven people, not just plaintiff); Bennett Aff. ¶ 5 (noting that Globe had no prior knowledge of plaintiff and therefore held no ill-will or desire to harm him). In response, plaintiff has only offered an affidavit alleging that he does not support illegal and violent activity in Israel and has no criminal background. Plaintiff offers no evidence that anyone involved personally knew plaintiff or had any possible reason to want to harm him. Plaintiff has not, therefore, raised any genuine issues of material fact that the material was published solely to harm him.

In addition, a comparison of the articles with the press release upon which they were based reveals that they do not in any way show the kind of inaccuracy or abuse of the fair report privilege which has been held to provide the basis for liability under the defamation law of Pennsylvania. *See Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971) (the qualified fair report immunity is forfeited by any "abuses [of] the occasion" or by exaggerated additions or embellishments in the account); *Williams v. WCAU–TV*, 555 F.Supp. 198, 201–02 (E.D.Pa.1983) (the fair report privilege is forfeited if the "gist" or "sting" of defendants' statements were untrue or produced a different "effect on the mind of the audience which the precise truth would have produced"); *Mosely v. Observer Publishing Co.*, 427 Pa.Super. 471, 629 A.2d 965 (1993); *Oweida v. Tribune–Review Publishing Co.*, 410 Pa.Super. 112, 599 A.2d 230 (1991). The only references to plaintiff in either Post's or Globe's articles that are not directly attributable to the Israeli press release are that plaintiff was involved in extreme right-wing activity and that he had been a member of the Jewish Defense League. However, these statements are accurate [20] and they do not alter the gists of the articles, which are the same as the gist of the press release—that plaintiff was "associated with planning illegal activities in Israel" and "might endanger public peace or . . . state security." Kovner Aff. Exh. B.

For these reasons, the court concludes that defendants Globe and Post have not forfeited their fair report privilege. Therefore, they are entitled to summary judgment.[21]

An appropriate order follows.

---

**20.** Prior to the article, plaintiff's membership in the Jewish Defense League was well documented, as was his arrest in Israel on charges related to right wing activity. In a February 11, 1994 article in the Jewish Exponent entitled *An Arrest in Israel Leaves Local Man Feeling 'Bitter*,' plaintiff objected to his arrest in Israel on suspicion of smuggling bombs. *See* Kovner Aff. Exh. D. The article stated that plaintiff planned to file a $100 million lawsuit for false arrest and defamation of character. *See id.* Plaintiff described himself as "right-wing" and said he had been active with the Jewish Defense League in America. Plaintiff also stated that he made contributions to what he called a "militant" Yeshiva in Jerusalem. *See id.*

**21.** Because the court concludes that Globe and Post are entitled to summary judgment because they have not forfeited their fair report privileges, it need not address Globe's final argument that summary judgment is appropriate because Globe is protected by the "wire service" defense. For the sake of completeness, however, the court notes that this contention would not entitle Globe to summary judgment. Under the "wire service" defense, republication of a news article published by a recognizable and reliable source of daily news cannot constitute defamation, unless the story was reproduced in a negligent manner. *See Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234 (1933) ("The mere reiteration in a daily newspaper, of an actually false, but apparently authentic news dispatch, received by the newspaper publisher from a generally recognized reliable source of daily news . . . cannot through publication alone be deemed per se to amount to an actionable libel . . . in the absence of some showing . . . that the publisher must have acted in a negligent, reckless or careless manner in reproducing it to another's injury.");*Winn v. Associated Press*, 903 F.Supp. 575 (S.D.N.Y.1995);*Nelson v. Associated Press*, 667 F.Supp. 1468, 1476 (S.D.Fla.1987);*Appleby v. Daily Hampshire Gazette*, 395 Mass. 32, 478 N.E.2d 721, 725 (1985). However, the wire service defense is currently unavailable under Pennsylvania law. Moreover, Globe has not brought forth the actual Reuters wire report upon which it relied when writing the article. Although the Bennett Affidavit states that Globe did not substantially change the Reuters wire report, and although plaintiff has not through his own affidavit provided the Reuters wire report or presented facts in contrast to those in Globe's affidavits, the court cannot make a determination as to whether

## ORDER

AND NOW, this 25th day of March, 1997, in consideration of the motions of defendant Jerusalem Post Publications, Ltd. and defendant Globe Newspaper Company "To Dismiss Or, In The Alternative, For Summary Judgment," plaintiff's response, and defendants' replies thereto, it is HEREBY ORDERED that

1) The motion for summary judgment of Defendant Jerusalem Post Publications, Ltd. is GRANTED.

2) The motion for summary judgment of Defendant Globe Newspaper Company is GRANTED.

3) The motions to dismiss of defendants Jerusalem Post Publications, Ltd. and Globe Newspaper Company are DENIED AS MOOT.

4) Judgment is entered in favor of defendants Jerusalem Post Publications, Ltd. and Globe Newspaper Company ONLY.

---

there exists a genuine issue of material fact as to the applicability of the wire service defense without examining the Reuters report. Without it, the court cannot definitively determine if Globe

substantially altered the report or unreasonably relied upon it when writing its article. Thus, the wire service defense does not provide a ground for summary judgment for Globe.